IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
Eastern Division (Youngstown)

| | | |
|---|---|---|
| Susan Beiersdorfer, *et al.*, | ) | |
| Plaintiffs, | ) | Case No. 4:19-cv-00260 |
| v. | ) | Judge Pearson |
| Frank LaRose, Secretary of State, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

\*     \*     \*     \*     \*

**PLAINTIFFS' MEMORANDUM RESPONSE IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS ATHENS COUNTY AND MEIGS COUNTY BOARDS OF ELECTIONS**

Now come Plaintiffs Susan Beiersdorfer *et al.*, by and through counsel, and respond in opposition to the "Motion to Dismiss of Defendants Athens County and Meigs County Boards of Elections" (hereinafter "Athens MTD").

## STATEMENT OF FACTS

Plaintiffs accept some of the factual recitation of the Defendant but articulate additional facts below. As the Court is aware, it must assume the truth of well-pleaded material allegations in the Complaint when considering a procedural dismissal motion. *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008)).

**The Local Democracy Struggle In Meigs County**

In 2015, interested citizens came together to form the Meigs County Home Rule Committee ("MCHRC"), which drafted a proposed charter for county government. Complaint ¶

156. MCHRC circulated initiative petitions for a proposed county charter that included provisions that would have prevented the use of underground injection wells for disposal of hydraulic fracturing ("fracking") oil and gas drilling wastes, and implemented water protections. The aim was to secure ballot placement for the November 2015 general election.

The MCHRC in July 2015 timely filed petitions with Defendant Meigs County Board of Elections ("Meigs BOE") that contained enough signatures for the initiative vote. Through corrupt manipulation, the Meigs County Commissioners declined to certify the initiative for ballot placement, causing the MCHRC to sue in mandamus and ultimately, the Ohio Supreme Court ruled, in *State ex rel. Meigs County Home Rule Committee v. Meigs County Board of Commissioners*, 68 N.E.3d 781, 148 Ohio St.3d 63, 2016-Ohio-5658 (2016) that "when the board of elections ultimately certifies the validity of a petition and the delay was not the fault of the initiative's supporters, a writ of mandamus will issue to place the matter on the ballot." But since the Ohio Supreme Court did not decide the matter until 2016, more than a year after committee petitioners first requested placement of the county charter initiative on the ballot, it was never presented to voters. Complaint ¶¶ 157-163.

In 2016, the Meigs County Home Rule Committee circulated another initiative petition for a county charter that contained similar water protections and a related prohibition against fracking. Then-Secretary of State Jon Husted prevented the initiative from being placed on the ballot and so MCHRC sued in mandamus to seek a court order requiring him to place the proposed charter on the ballot. But the Ohio Supreme Court upheld the Secretary's unlawful content-based review instead. *State ex rel. Coover v. Husted*, 148 Ohio St.3d 332, 70 N.E.3d 587, 2016-Ohio-5794 (2016). Complaint ¶¶ 164-166. The Meigs charter petition had incorporated

by reference the statutory provisions that assigned county government officers the powers vested in, and performance of duties imposed upon county officers by, "general law." The Court found that to be an insufficient description of Meigs County officials' responsibilities, because voters would have to consult legal sources outside the charter proposal to determine the elected officers' "duties" purported to be established. According such discretion to elections officials necessarily allows substantive, content-based review of a proposed initiative by election officials. Complaint ¶¶ 167-169. By allowing county election officials to arbitrarily interpret the county charter initiative provisions contained in the Ohio Constitution, petitioners are arbitrarily denied the right to initiative because it is impossible for them to know all of the requirements that election officials and the courts may impose, pre-enactment, based on subjective interpretations.

As Plaintiffs noted in the Complaint, the petitioners in Meigs followed the same practice as other petitioners for county charters by incorporating statutory controls over the charters by reference instead o reproducing the elected county officers' duties within the petition itself. That practice was acceptable until it wasn't, when in 2016 Secretary of State Husted suddenly and arbitrarily changed his mind, and ultimately was backed up by the Ohio Supreme Court, discussed in detail below.

### The Local Democracy Struggle In Athens County

The Athens Community Bill of Rights Committee ("ACBORC") formed in 2013 around concerns about oil and gas hydraulic fracturing and the practice of using injection wells for disposal of its wastes on the county's water supply. In 2015, ACBORC circulated a county charter petition aimed, among other things, at halting the waste injection going into townships outside the Athens city limits. Defendant Athens County BOE refused to certify the proposed

county charter for placement on the ballot. After ACBORC lodged a formal protest, the then-Ohio Secretary of State Jon Husted refused to put the Athens County Charter proposal on the ballot because it supposedly failed to create an "alternative form of government" by not providing for the election or appointment of a county executive or any change in the structure of county government; and it contained a prohibition on hydraulic fracturing that according to Husted conflicted with exclusive pre-emptive authority of the State of Ohio to regulate oil and gas operations in Ohio. ACBORC, along with county charter bill of rights committees in Medina and Fulton Counties, filed a mandamus action in the Ohio Supreme Court. Complaint ¶¶ 176-180. The Court refused to order placement of the proposed measures on the ballot, thereby allowing election officials to serve as "gatekeepers" in violation of the First Amendment. *State ex rel. Walker v. Husted,* 144 Ohio St.3d 361, 43 N.E.3d 419, 2015-Ohio-3749 (2015). *Id.* ¶ 181.

In 2016, ACBORC mobilized again with a somewhat modified county charter proposal, attempting to address the Court's cryptic instructions as to the minimum requirements for a charter amendment. This too was rejected from the ballot following the Athens County BOE's impermissible content-based review, because the proposal supposedly failed to alter the form of government, failed to vest powers from the municipalities and townships with the county, and relied on the Ohio Revised Code to determine the qualifications and salaries of elected officials. Complaint ¶¶ 182-183. The Ohio Supreme Court again denied ballot access by upholding the BOE's unconstitutional content-based review and by engaging in its own unconstitutional pre-enactment content-based review. *State ex rel. Coover v. Husted*, 148 Ohio St.3d 332, 70 N.E.3d 587, 2016- Ohio-5794, ¶ 17 (2016). *Id.* at ¶¶184-185.

In 2017, the Athens Committee campaigned for a county charter again containing a

community bill of rights. The Athens Committee made some substantive changes to the content of the proposal to accommodate the arbitrary standards imposed by election officials and the Supreme Court, but after conducting an unconstitutional content-based review, the BOE concluded that the proposed county charter did not adequately provide for an alternative form of county government, that the charter contained provisions outside the initiative power because they are not within a county's authority to enact, and that the proposal failed to provide for the exercise of all powers and duties of county government. Complaint ¶¶ 185-186. ACBORC joined the petitioning committee in Medina County in petitioning the Ohio Supreme Court in mandamus. Sustainable Medina County had been rebuked , not for incorporating by reference but for drafting a county charter petition that reproduced voluminous parts of the Ohio Revised Code but still didn't articulate 100% of the duties of county officials. Complaint ¶¶ 187-188, 206-209. But in *State ex rel. McGinn v. Walker*, 87 N.E.3d 204, 151 Ohio St.3d 199, 2017-Ohio-7714, ¶ 17 (2017), the Ohio Supreme Court again affirmed the Boards of Elections' use of unconstitutional pre-enactment content-based review.

## LAW AND ARGUMENT

In response to the Athens County and Meigs County Boards of Elections, Plaintiffs incorporate by reference their arguments made in response to the other Defendants' Motions for Judgment on the Pleadings or Motions to Dismiss, at ECF Nos. 40, 45, 48, 67, 76. In the interest of judicial efficiency, Plaintiffs do not repeat those rule statements and arguments here, but rather apply those precepts to the actions of the two BOEs.

The Athens and Meigs BOES assert that Plaintiffs' claims can be dismissed in light of this Court's Memorandum of Opinion and Order filed August 30, 2019, and the Sixth Circuit

Court of Appeals' decision in *Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019). Plaintiffs disagree.

**A. Complaint Counts 1 through 5 May Not Be Dismissed
On The Basis Of *Schmitt* Reasoning**

Defendants assert (Athens Motion at 6) that "Ohio's ballot-initiative laws * * * do not directly restrict core expressive conduct, rather, the laws regulate the process by which initiative legislation is put before the electorate, which has as its most, a second-order effect on protected speech." *Schmitt v. LaRose,* 963 F.3d 628, 638 (6th Cir. 2019). Ohio's ballot initiative laws have not been subject to strict scrutiny. *Id*. at 639, 641.

The statutory process embodied in HB 463 isn't a "second-order effect on protected speech" per *Schmitt.* Rather, it is a first-order bludgeon created by the Ohio General Assembly to reduce the Article I, § 2 initiative power to utter uselessness, leaving it on the books as merely a quaint legal nullity.

The HB 463 changes are not neutral in intent or application. The new statutes prompt governmental scrutiny and confer a discretionary power upon Boards of Election to engage in pre-election censorship. Respecting county charters, BOEs are to decide "Whether the petition falls within the scope of a county's authority to enact via initiative," which entails quite a laundry list, including "whether the petition conforms to the requirements set forth in Section 3 of Article X of the Ohio Constitution, including the exercise of only those powers that have vested in, and the performance of all duties imposed upon counties and county officers by law, and whether the petition satisfies the statutory prerequisites to place the issue on the ballot." O.R.C. § 3501.38(M)(1)(b).

This is quasi-judicial review of a *proposed* law. The statute is not value-neutral at all. It

amounts to a contrivance by which Executive Branch boards of election are directed to identify contents of an initiative that would change or counter pre-existing law and then, to render a subjective value judgment as to whether such alterations of existing law are consonant with BOE members' opinions of what Ohio law supposedly says and requires. Moreover, that BOE value judgment is handed down in a hurried pre-election atmosphere when the most that can be expected of courts is anecdotal mandamus review set, in the Ohio Supreme Court, to the tempo hyper-accelerated briefing cycle in the form of three-day increments (weekends included). In practice, the supposedly value-neutral statutory regulation further heightens the pressures of this lock-step Executive Branch veto with an all-or-nothing feature whereby the slightest offending phraseology in the initiative dooms the entire proposal, irrespective of whether the proposal contains a severability clause.

By O.R.C. § 3501.38(M)(1)(b), democratically-initiated county charter proposals, launched with literally thousands of hours of uncompensated volunteer effort, can be crippled by the ideological inclinations of two Board of Elections members plus the veto vote of the Secretary of State. Boards of Elections have been reconstructed as an administrative court, without staffing for making constitutional determinations, without qualifications, and clearly in violation of separation-o-powers precepts. They are equipped by HB 463 to destroy any offending county charter proposal that the BOE members decide does not live up to their expectations. Proposals that offend local political elites will easily be denied a place on the ballot, leaving the measure's proponents with mandamus recourse to the courts. This derogates the precept that "An unconstitutional amendment may be a proper item for referendum or initiative." *State ex rel. Youngstown v. Mahoning Cty. Bd. of Elections*, 144 Ohio St.3d 239,

2015-Ohio-3761, 41 N.E.3d 1229, ¶ 11. The Court continued, "Such an amendment becomes void and unenforceable only when declared unconstitutional by a court of competent jurisdiction. Any other conclusion would *authorize a board of elections to adjudicate a constitutional question and require this court to affirm its decision even if the court disagreed with the board's conclusion on the underlying constitutional question, so long as the board had not abused its discretion*." *Id.* (emphasis added).

Shortly after the 1912 Constitutional Convention which added Ohio Const. Art. I, § 2 initiative powers, the Ohio Supreme Court commenced a 100-year policy to forcefully rule out any inquiries into the content of initiated measures proposed by the People, reasserting this holding over and over again. This bright-line constitutional precept is the Ohio Supreme Court's unswerving demarcation of "political discourse that surrounds an initiative effort": the People are completely free to initiate and enact a law containing any content they choose; even "[a]n unconstitutional amendment may be a proper item for referendum or initiative." *State ex rel. Youngstown v. Mahoning Cty. Bd. of Elections*, 144 Ohio St.3d 239, 2015-Ohio-3761, 41 N.E.3d 1229, ¶ 11. This so because "[t]he proper time for an aggrieved party to challenge the constitutionality of a proposed charter amendment is after the voters approve the measure, assuming they do so." *State ex rel. Ebersole v. City of Powell*, 2014-Ohio-4283, 21 N.E.3d 274, ¶¶ 2, 6, 7. The boards of election are limited to considering the "propriety of its submission to the voters," not the legality or efficacy of the initiated proposal. *State ex rel. N. Main St. Coalition v. Webb*, 106 Ohio St.3d 437, 2005-Ohio-5009, ¶ 38 (2005); *see also State ex rel. Brecksville v. Husted*, 133 Ohio St.3d 301, 2012- Ohio-4530, ¶ 14 (claim that public policy requires removal of initiative from the ballot because electorate cannot force mayor to speak in support of an issue

contrary to the U.S. Constitution attacks substance of proposed ordinances; challenge is premature before adoption of the proposed ordinance by the people); *State ex rel. DeBrosse v. Cool*, 87 Ohio St.3d 1, 6 (1999) ("Any claims alleging the unconstitutionality or illegality of the substance of the proposed ordinance, or action to be taken pursuant to the ordinance when enacted, are premature before its approval by the electorate."); *State ex rel. Cramer v. Brown*, 7 Ohio St.3d 5, 6, 7 OBR 317, 318 (1983) ("It is well-settled that this court will not consider, in an action to strike an issue from the ballot, a claim that the proposed amendment would be unconstitutional if approved, such claim being premature."); *State ex rel. Espen v. Wood Cty. Bd. of Elections*, 2017-Ohio-8223, ¶¶ 13-15 (2017); *State ex rel. Youngstown v. Mahoning Cty. Bd. of Elections*, 144 Ohio St.3d 239, 2015-Ohio-3761, 41 N.E.3d 1229, ¶ 11; *State ex rel. Walker v. Husted*, 144 Ohio St.3d 361, 2015-Ohio-3749, ¶ 15 (2015); State ex rel. Lange v. King, 2015-Ohio-3440, 2015-1281, ¶ 11 (2015); *State ex rel. Kilby v. Summit Cty. Bd. of Elections*, 133 Ohio St.3d 184, 2012-Ohio-4310, ¶ 12 (2012); *State ex rel. Ohio Liberty Council v. Brunner*, 125 Ohio St.3d 315, 2010-Ohio-1845, ¶ 24 (2010); *State ex rel. Citizen Action for a Livable Montgomery v. Hamilton Cty. Bd. Of Elections*, 115 Ohio St.3d 437, 2007-Ohio-5379, ¶ 43 (2007); *State ex rel. Lewis v. Rolston*, 115 Ohio St.3d 293, 2007-Ohio-5139, ¶ 28 (2007); *Mason City School Dist. v. Warren Cty. Bd of Elections*, 107 Ohio St.3d 373, 2005-Ohio-5363, ¶ 21 (2005); *State ex rel. Commt. for the Charter Amendment v. Westlake*, 97 Ohio St.3d 100, 2002-Ohio-5302, ¶ 43 n. 3 (2002); *State ex rel. Hazel v. Cuyahoga Cty. Bd of Elections*, 80 Ohio St.3d 165, 169 (1997); *State ex rel. Thurn v. Cuyahoga Cty. Bd of Elections*, 72 Ohio St.3d 289, 293 (1995); *State ex rel. Williams v. Iannucci*, 39 Ohio St.3d 292, 294 (1988); *Jurcisin v. Cuyahoga Cty. Bd. of Elections*, 35 Ohio St.3d 137, 146 (1988); *State ex rel. Walter v. Edgar*, 13 Ohio St.3d 1, 2

(1984); *State ex rel. Williams v. Brown*, 52 Ohio St.2d 13, 17-18 (1977); *State ex rel. Kittel v. Bigelow*, 138 Ohio St. 497, syll. (1941); *State ex rel. Marcolin v. Smith*, 105 Ohio St. 570, 138 N.E. 881, syll. (1922); *Cincinnati v. Hillenbrand*, 103 Ohio St. 286, syll. ¶ 2 (1921); and *Weinland v. Fulton*, 99 Ohio St. 10, syll. (1918).

Even in mandamus litigations in which the Plaintiffs in this lawsuit have participated, the Ohio Supreme Court has reasserted this crucial holding. *See, e.g., Walker v. Husted*, 144 Ohio St.3d 361, 2015-Ohio-3749, 15 (2015); *State ex rel. Espen v. Wood Cty. Bd. of Elections*, 2017-Ohio-8223, 2017 WL 4701143 (2017). But instead of letting Plaintiffs' duly-qualified measures appear on the ballot, the county Boards of Elections, the Secretary of State and the Ohio Supreme Court have fashioned new *ad hoc* criteria to stop proposed measures from appearing on the ballot. The rule against pre-election content-based inquiry has been swallowed by a swarm of "procedural" or "subject-matter" exceptions that ultimately deny the people their constitutional rights.

Counts 1 through 5 must be allowed to proceed to adjudication because of the implications of the Ohio Supreme Court's 100-year consistent prohibition on assessing content of initiated measures. The meaning of the century-long judicial policy is that Ohio's voters have complete freedom to legislate as they wish on any subject. Ohio law categorically denies no one the right and authority to initiate, vote on, and enact into law a proposal on any subject. Ohio's initiative process is, throughout, "core political speech" within the ambit of *Meyer v. Grant*. 486 U.S. 414, 415, syll., 100 L.Ed.2d 425 (1988) ("[T]he power to ban initiatives entirely does not include the power to limit discussion of political issues raised in initiative petitions"). The Ohio initiative process allows political statements to be made on the ballot via initiative.

Athens/Meigs' BOES contend (Motion to Dismiss at 5-6) that "Plaintiffs' allegations do not involve protected political speech of the nature involved in decisions dealing with the circulation of petitions for proposed initiatives" because *Meyer* supposedly only protects speech around circulation of a petition. But in Ohio, the unfettered, global range of petition subject matter and content – regulated post-election by the courts – makes the petition a component of the speech, because initiatives can be used to prompt political policymaking or policy changes even when they are not strictly lawful or constitutional as written.

> In 1915, the Ohio Supreme Court said, of the then-new initiative and referendum powers:
>
> Now, the people's right to the use of the initiative and referendum is one of the most essential safeguards to representative government. * * * The potential virtue of the 'I. & R.' does not reside in the good statutes and good constitutional amendments initiated, nor in the bad statutes and bad proposed constitutional amendments that are killed. Rather, the greatest efficiency of the 'I. and R.' rests in the wholesome restraint imposed automatically upon the general assembly and the governor and the possibilities of that latent power when called into action by the voters.

*State ex rel. Nolan v. Clendening*, 93 Ohio St. 264, 277–278, 112 N.E. 1029 (1915), quoted in *State ex rel. LetOhioVote.org v. Brunner*, 2009-Ohio-4900, ¶¶ 19-20, 123 Ohio St. 3d 322, 328, 916 N.E.2d 462, 470 (2009).

Consequently, the People have powers *superior to the combined powers of the Governor and General Assembly when they initiate laws*. The People are the only entity that can exert "wholesome restraints" on the Executive and Legislative branches, including the power to create and amend county and city charters – which are local constitutions. While the General Assembly prefers to treat these constitutional powers as if they are gifts bestowed by the state, subject to legislative interpretation and even *sub silentio* repeal, and so provide no cognizable constitutional protection, it is the People who hold the highest authority in state law.

In Ohio, the state Supreme Court has indeed interpreted the state Constitution to make the ballot a public forum for speech, in the form of initiatives that must be put to a vote even if unlawful or unconstitutional as written. The wording and substance of the initiative itself is indelibly a component of the political discourse that surrounds an initiative effort, and is owed First Amendment protection.

In Ohio, executive or judicial officials may not interfere in the legislative process of the General Assembly by preventing a vote on a bill. This Court must step in to keep that from happening to the people's legislative process.

"[T]he power to ban initiatives entirely does not include the power to limit discussion of political issues raised in initiative petitions." *Meyer v. Grant*. 486 U.S. 414, 415, syll., 100 L.Ed.2d 425 (1988) (); *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring) ("The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind. . . . ").

**B. The Statutory Scheme Fails Under <u>Anderson-Burdick</u> Analysis**

Meigs and Athens BOEs cite *Schmitt* and its use of the *Anderson-Burdick* framework to assert that "Ohio's ballot review process 'does not severely burden Plaintiffs' rights under the First Amendment to engage in political expression,'" and that "flexible analysis," not "rational basis," review is appropriate. (Citing *Schmitt*, 963 F.3d 628, 639).

This reasoning is flawed. The *Anderson-Burdick* framework weighs the character and magnitude of the burden the State's rule imposes on Plaintiffs' First Amendment rights against the interests the State contends justify that burden, and considers the extent to which the State's

concerns make the burden necessary. The Sixth Circuit described the three *Anderson-Burdick* [1] steps as follows:

> The first, most critical step is to consider the severity of the restriction. Laws imposing severe burdens on plaintiffs' rights are subject to strict scrutiny, but lesser burdens trigger… less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. Regulations that fall in the middle warrant a flexible analysis that weighs the state's interests and chosen means of pursuing them against the burden of the restriction. At the second step we identify and evaluate the state's interests in and justifications for the regulation. The third step requires that we assess the legitimacy and strength of those interests and determine whether the restrictions are constitutional.

(citations and internal quotation marks omitted). *Schmitt* at 639. The Sixth Circuit has stated that "[t]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016).

In this case, both the Athens and Meigs County BOEs have excluded the Plaintiffs' initiatives from the ballot, and the Plaintiffs have alleged in the Complaint numerous examples of how other BOE Defendants have excluded proposed charter amendments from the ballot. These include situations where Defendants have engaged in unlawful reviews of the substance of proposed charter amendments to exclude proposed initiatives from the ballot, Complaint, ¶¶108-230. The Plaintiffs also described how pre-enactment substantive review largely precludes controversial measures from the ballot and effectively curtails campaigning focused on debate over the measures from the point of wrongful ballot exclusion to election day, "depriving voters of the opportunity to vote on such measures." Complaint, ¶¶ 80-81. And, they have shown that content-based, substantive pre-enactment review of proposed ballot measures interferes with core

---

[1] Derived from the Supreme Court's holdings in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi* 504 U.S. 428 (1999).

political speech and petition for redress of grievances, violates voters' fundamental right to vote, and inhibits citizens from reforming or altering their current form of government. Complaint ¶ 239.

Oddly, while the Court cited the *Grimes* assessment that the "hallmark of a severe burden is exclusion or virtual exclusion from the ballot," it proceeded to find that "Plaintiffs, however, have not been burdened with exclusion or virtual exclusion from participating in the election process. Rather, they have been restricted from placing initiatives on the ballot that were determined by state officials to exceed the scope of legislative authority." Opinion and Order at 18. The Court mistakenly sees the exclusion of Plaintiffs' initiatives from the ballot as the product of rote procedural rulings by boards of election or the secretary of state instead of what they are, case-by-case content-weighing judgments which then allow "exclusion. . . from the ballot." This is not the same as the BOE determining that an initiative petition failed to gather sufficient signatures, which is a clear factual determination of the kind appropriate for the BOE. Instead, and at issue here, the General Assembly, through HB 463, has purported to give BOEs the power to conduct judicial review of a proposed measure pre-election and thereby determine whether it is excluded from the ballot.

Plaintiffs, the Court continues, "remain free to exercise the initiative power in compliance with Ohio's initiative ballot statutes." Opinion and Order at 18. But what Plaintiffs "remain free to exercise" is participation in a recurring and egregious guessing game of how a particular majority of elections officials will interpret such things as local government powers and pre-emption. The Court erroneously believes that "Plaintiffs offer nothing more than conclusory allegations that the ballot initiative statutes were applied based on content." Plaintiffs are not

conclusionary or failing in any evidentiary respect; the challenged statutes *order* unqualified elections officials (as Franklin County BOE member Sinnott confessed) "to determine. . . [w]hether the petition falls within the scope of a municipal political subdivision's authority to enact. . . " by considering, construing and applying "the limitations placed by Sections 3 and 7 of Article XVIII of the Ohio Constitution on the authority of municipal corporations to adopt local police, sanitary, and other similar regulations as are not in conflict with general laws, and whether the petition satisfies the statutory prerequisites to place the issue on the ballot."

To the contrary, Plaintiff's proofs are conclusive and extraordinary evidence in the form of the statutory commands themselves. On its face, the statutory scheme mandates content analysis by elections officials before an initiative can go to the ballot. The sole allowable "engagement in political expression" left to Plaintiffs, then, is a shell game prompted by the recurring need for the People to guess what content in an initiative petition will finally be acceptable to the election agency commissariat for it to proceed to the ballot. While it wouldn't clear up the enormous constitutional defects in this process, the General Assembly has omitted from the legal checklist in § 3501.38 obedience by elections officials to the century of Ohio Supreme Court jurisprudence against content vetoes. That, alone, is an ominous signal that the legislature has arrogantly usurped the Ohio Constitution.

The Court places a surprising degree of confidence in nonjuridical, untrained elections regulators as the final arbiters to decide what comprises the "scope of state law" instead of the courts, post-election. This improper delegation of power is made even more absurd by the all-or-nothing application of the statutes under challenge. A BOE or SOS finding of exceeding-the-scope as to any part of an initiative bars the entire measure from the People's vote.

**C. Incorporation By Reference Of Responsive Arguments**
**As To Counts Six, Seven and Eight**

In response to Defendants' arguments for dismissal of Counts Six, Seven and Eight of the Complaint, Plaintiffs hereby incorporate fully herein by reference their arguments appearing on pp. 9-13 of ECF 76, "Plaintiffs' Response to Defendant Portage County Board of Elections' Motion to Dismiss."

**D. Conclusion**

The Court analyzed the ballot access terms of the HB 463 scheme only as process, when in fact the statutes oblige boards of election to dive directly into the contents of initiative proposals and execute a complicated analysis of sifting, weighing, and speculation, all directed at producing a probabilistic assessment of the lawfulness of a proposed measure as filtered through the BOE's unstandardized comprehension of Ohio law. That complicated process in turn will yield a stream of censorious decisions from the Executive Branch which, by virtue of the limited pre-election time to decide, plus the nature of the circumscribed mandamus remedy, eviscerates the longstanding role of the courts.

Election authorities in Ohio are not merely managing how measures are placed before the public. The Secretary of State and BOEs are ordered by the General Assembly to ferret out initiatives that would legislate change. Because controversial initiatives could change the *status quo*, any argument concerning their unconstitutionality, if adopted by 3 votes of a Board of Elections or 2 votes plus the tiebreaker of the Secretary of State, suffices to snuff the use of initiated county charters despite the nature of initiative as a core speech and democracy right.

The Plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face" against the Athens County and Meigs County BOEs. *Traverse Bay Area Immediate Sch.*

*Dist. v. Mich. Dep't of Educ.,* 615 F.3d 622, 627 (6th Cir. 2010). Therefore, Defendants' motion should be denied.

**WHEREFORE**, Plaintiffs pray the Court deny the Athens County and Meigs County Boards of Elections' Motion to Dismiss in its entirety.

>  */s/ Terry J. Lodge*
> Terry J. Lodge, Esq.
> 316 N. Michigan St., Suite 520
> Toledo, OH 43604-5627
> (419) 205-7084
> tjlodge50@yahoo.com
>
> */s/ Lindsey Schromen-Wawrin*
> Lindsey Schromen-Wawrin, Esq.
> Shearwater Law PLLC
> 306 West Third Street
> Port Angeles, WA 98362
> lindsey@ShearwaterLaw.com
> (OpenPGP key available)
> phone: (360) 406-4321
> Co-Counsel for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2020, I deposited a copy of the foregoing Memorandum Response in Opposition into the Electronic Case Filing system maintained by the Court, and that according to protocols of the system, it was electronically served upon all counsel registered to receive electronic filings.

> */s/ Terry J. Lodge*
> Terry J. Lodge, Esq.
> Co-Counsel for Plaintiffs