IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
Eastern Division (Youngstown)

| | |
|---|---|
| Susan Beiersdorfer, *et al.*,  ) | |
| Plaintiffs,  ) | Case No. 4:19-cv-00260 |
| v.  ) | Judge Pearson |
| Frank LaRose, Secretary of State, *et al.*,  ) | |
| Defendants.  ) | |
| ) | |

\*  \*  \*  \*  \*

**<u>PLAINTIFFS' MEMORANDUM RESPONSE IN OPPOSITION TO MEDINA COUNTY BOARD OF ELECTIONS' MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

Now come Plaintiffs Susan Beiersdorfer *et al.*, by and through counsel, and respond in opposition to the "Motion for Judgment on the Pleadings of Defendant Medina County Board of Elections" (hereinafter "MJOP").

**STATEMENT OF FACTS**

Plaintiffs accept some of the factual recitation of the Defendant but articulate additional facts below. As the Court is aware, it must assume the truth of well-pleaded material allegations in the Complaint when considering a procedural dismissal motion. *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008)).

Starting in 2015, Sustainable Medina members annually drafted and proposed a county charter (three in all) to alter the form of government in Medina County. In 2015, 2016 and 2017, Sustainable Medina members gathered, on average, more than 6,000 signatures annually those proposals on the ballot. Complaint ¶ 192. To have 6,000 viable signatures to gain ballot

access requires the gathering of 20% to 40% more than the requirement to account for people whose voter registrations have expired or who never registered at all, or who move by the time the signatures are verified.

The county charters were intended to empower county officials to create and pass local legislation, and to institute a charter county that extended the right to initiate legislation to residents of unincorporated parts of the county. *Id.* at ¶ 194. Sustainable Medina County's charters reformed county government offices and responsibilities and further included provisions creating the rights of nature; prohibited hydraulic fracturing for oil and gas (fracking) in the county; prohibited injection wells for disposal of oil and gas wastes; and banned commercial transport pipelines from traversing Medina County. *Id.* at ¶ 195.

When Plaintiffs Jones and other members of Sustainable Medina sued in mandamus in the Ohio Supreme Court (*State ex rel. Walker v. Husted*, 144 Ohio St.3d 361, 43 N.E.3d 419, 2015-Ohio-3749 (2015)), the Ohio Supreme Court upheld the then-Secretary of State's content-based review, concluding that a provision in the petition that incorporated general law by reference did not satisfy the Court's *sua sponte* requirement that a charter must contain within its four corners an adequate description of the form of proposed county government, and because the petition incorporated by reference, it did not contain a complete explanation of which county officers shall be elected and the manner of their election. *Id.* at ¶¶ 199-200.

Undaunted, in 2016, Sustainable Medina circulated a modified county charter petition. The group filed sufficient signatures on a county charter initiative for certification to the November 2016 ballot. *Id.* at ¶ 201. Plaintiffs' petition was again denied ballot access, and they again sued in the Ohio Supreme Court for mandamus relief. *State ex rel. Jones v. Husted*, 65

N.E.3d 733, 147 Ohio St.3d 341, 2016-Ohio-5681 (2016). 204. This time, Plaintiffs faced the imposition of *ad hoc* and inadequate procedures in violation of their First Amendment rights. The Ohio Supreme Court declined to consider Plaintiffs' arguments as to why the proposed measure should have been placed on the ballot; instead, they faulted petitioners for failing to pursue their "adequate remedy in the ordinary course of law," namely, either (1) a protest of the board's decision before the secretary of state under O.R.C. § 307.95, or (2) a request that the BOE bring an action in the common pleas court to establish the validity of the petition under O.R.C. § 307.94. *Id.* at 344. Because the time had elapsed for the pursuit of either remedy, petitioners, including Plaintiff Jones, were denied ballot access. *Id.* at ¶¶ 203, 204.

In 2017, Sustainable Medina introduced a new, modified county charter proposal seeking a restructuring of the county government and legislating of a local bill of rights that included a ban on natural gas mega-pipelines. The proposed charter included a detailed description of powers and duties of each elected official and the petition ran more than 12 pages, comprised largely of statutory wording on county officials' duties from the Ohio Revised Code. The proposal did not incorporate powers and duties by reference since for two years in a row, the Ohio Supreme Court had said that drafting approach was impermissible and that the charter must contain everything within its four corners. *Id.* at ¶ 206. But Defendant Medina County BOE voted 3-1 against certification of the petition based on impermissible content-based review. Sustainable Medina County joined with the Athens County Bill of Rights Committee to sue for mandamus in *State ex rel. McGinn v. Walker*, 87 N.E.3d 204, 151 Ohio St.3d 199, 2017-Ohio-7714 (2017). *Id.* at ¶¶ 207, 209. This time, the Ohio Supreme Court, in its own unconstitutional pre-enactment review, imposed a new *ad hoc* rule requiring the Medina charter proposal to

contain a "catch-all provision" which incorporated by reference all duties of county officials not specifically spelled out in the proposal. *Id.* at ¶ 210/. The Court contradicted its rulings in the prior two years wherein it had required inclusion of catch-all provisions in the proposed charters because the charter must contain everything within its four corners.

Plaintiffs' pursuit of their right to legislate did not end there. During the time they pursued mandamus relief in the Ohio Supreme Court in 2017, they simultaneously pursued non-mandamus relief in the form of the statutory appeal of the Board of Elections' rejection of the petition to the Medina County Common Pleas Court as provided by O.R.C. § 307.94, but were denied ballot placement. *Id.* at ¶ 211. Sustainable Medina promptly appealed to the Ninth Ohio District Court of Appeals. *County Charter Proposal Committee of Petitioners v. Medina County Board of Elections*, Ninth Dist. Ct. App. No. 17CA0055, and the matter was placed on the Court of Appeals' accelerated docket. However, a ruling of mootness was entered on October 6, 2017, based on the Ohio Supreme Court's ruling in *McGinn* (the mandamus action), dated September 21, 2017. *Charter Proposal Committee of Petitioners v. Medina County Board of Elections,* Ninth Dist. Ct. App. No. 17CA0055 (Oct. 6, 2017) (Slip op.). *Id.* at ¶¶ 212, 213.

The Ohio Supreme Court declined to certify the case, leaving important issues unaddressed by any court and keeping the charter off the ballot. *County Charter Proposal Committee of Petitioners v. Medina County Board of Elections*, 96 N.E.3d 299, 2018-Ohio-1600 (S.Ct. 2018). *Id.* at ¶ 214.

**LAW AND ARGUMENT**

In response to the Medina County Board of Elections, Plaintiffs incorporate by reference their arguments made in response to the other Defendants' Motions for Judgment on the

Pleadings or Motions to Dismiss, at ECF Nos. 40, 45, 48, 67, 76. In the interest of judicial efficiency, Plaintiffs do not repeat those rule statements and arguments here, but rather apply those precepts to the actions of Medina County BOE.

**A. The Right To Initiative Is A Hard-Won Constitutional Right
In Ohio That Has Been Curtailed By A Mere Statute**

Defendant Medina BOE accuses Plaintiffs of practicing democracy: "Plaintiffs essentially assert they are entitled to place anything on the ballot they desire and any pre-election review is equivalent to a prior restraint on speech in violation of the first amendment or deprivation of their fundamental right of self-government as applied through the ninth amendment." MJOP at 1. Plaintiffs plead guilty, but with solid reason for their argument – or, rather, with dozens of solid reasons.

The People of Ohio in 1912 created and assert the authority to enact laws through an initiative process, which encompasses priority powers of constitutional magnitude and is enshrined in the Ohio Constitution. The People of Ohio reserved unto themselves the power to enact a county charter, Ohio Const. Art. X, § 3, to amend a municipal charter, *id.* Art. XVIII, § 7, and to enact a municipal ordinance, *id.* Art. II, § 1.

This express reservation of direct democracy in the form of initiative and referendum processes was the core focus of the 1912 Ohio Constitutional Convention. The convention was the reaction to over sixty years of the state legislature's unbridled supremacy that resulted from the 1853 Constitution. Those sixty years saw the rise of the robber barons during the Gilded Age, when the General Assembly was selling charters to monopolists. In response, the people gathered in 1912 and amended the Constitution to insert initiative and referendum and the Home Rule Amendment (which was politically watered-down, but still brought into being some notion of

local rule).

Shortly after the 1912 Convention, the Ohio Supreme Court began, for the ensuring 100 years, to forcefully rule out any inquiries into the content of initiated measures proposed by the People, reasserting this holding over and over again.  This bright-line constitutional precept is the Ohio Supreme Court's unswerving demarcation of "political discourse that surrounds an initiative effort:" the People are completely free to initiate and enact a law containing any content they choose; even "[a]n unconstitutional amendment may be a proper item for referendum or initiative." *State ex rel. Youngstown v. Mahoning Cty. Bd. of Elections*, 144 Ohio St.3d 239, 2015-Ohio-3761, 41 N.E.3d 1229, ¶ 11.  This so because "[t]he proper time for an aggrieved party to challenge the constitutionality of a proposed charter amendment is after the voters approve the measure, assuming they do so." *State ex rel. Ebersole v. City of Powell*, 2014-Ohio-4283, 21 N.E.3d 274, ¶¶ 2, 6, 7. The boards of election are limited to considering the "propriety of its submission to the voters," not the legality or efficacy of the initiated proposal. *State ex rel. N. Main St. Coalition v. Webb*, 106 Ohio St.3d 437, 2005-Ohio-5009, ¶ 38 (2005); *see also State ex rel. Brecksville v. Husted*, 133 Ohio St.3d 301, 2012- Ohio-4530, ¶ 14 (claim that public policy requires removal of initiative from the ballot because electorate cannot force mayor to speak in support of an issue contrary to the U.S. Constitution attacks substance of proposed ordinances; challenge is premature before adoption of the proposed ordinance by the people); *State ex rel. DeBrosse v. Cool*, 87 Ohio St.3d 1, 6 (1999) ("Any claims alleging the unconstitutionality or illegality of the substance of the proposed ordinance, or action to be taken pursuant to the ordinance when enacted, are premature before its approval by the electorate."); *State ex rel. Cramer v. Brown*, 7 Ohio St.3d 5, 6, 7 OBR 317, 318 (1983) ("It is well-settled that

this court will not consider, in an action to strike an issue from the ballot, a claim that the proposed amendment would be unconstitutional if approved, such claim being premature."); *State ex rel. Espen v. Wood Cty. Bd. of Elections*, 2017-Ohio-8223, ¶¶ 13-15 (2017); *State ex rel. Youngstown v. Mahoning Cty. Bd. of Elections*, 144 Ohio St.3d 239, 2015-Ohio-3761, 41 N.E.3d 1229, ¶ 11; *State ex rel. Walker v. Husted*, 144 Ohio St.3d 361, 2015-Ohio-3749, ¶ 15 (2015); State ex rel. Lange v. King, 2015-Ohio-3440, 2015-1281, ¶ 11 (2015); *State ex rel. Kilby v. Summit Cty. Bd. of Elections*, 133 Ohio St.3d 184, 2012-Ohio-4310, ¶ 12 (2012); *State ex rel. Ohio Liberty Council v. Brunner*, 125 Ohio St.3d 315, 2010-Ohio-1845, ¶ 24 (2010); *State ex rel. Citizen Action for a Livable Montgomery v. Hamilton Cty. Bd. Of Elections*, 115 Ohio St.3d 437, 2007-Ohio-5379, ¶ 43 (2007); *State ex rel. Lewis v. Rolston*, 115 Ohio St.3d 293, 2007-Ohio-5139, ¶ 28 (2007); *Mason City School Dist. v. Warren Cty. Bd of Elections*, 107 Ohio St.3d 373, 2005-Ohio-5363, ¶ 21 (2005); *State ex rel. Commt. for the Charter Amendment v. Westlake*, 97 Ohio St.3d 100, 2002-Ohio-5302, ¶ 43 n. 3 (2002); *State ex rel. Hazel v. Cuyahoga Cty. Bd of Elections*, 80 Ohio St.3d 165, 169 (1997); *State ex rel. Thurn v. Cuyahoga Cty. Bd of Elections*, 72 Ohio St.3d 289, 293 (1995); *State ex rel. Williams v. Iannucci*, 39 Ohio St.3d 292, 294 (1988); *Jurcisin v. Cuyahoga Cty. Bd. of Elections*, 35 Ohio St.3d 137, 146 (1988); *State ex rel. Walter v. Edgar*, 13 Ohio St.3d 1, 2 (1984); *State ex rel. Williams v. Brown*, 52 Ohio St.2d 13, 17-18 (1977); *State ex rel. Kittel v. Bigelow*, 138 Ohio St. 497, syll. (1941); *State ex rel. Marcolin v. Smith*, 105 Ohio St. 570, 138 N.E. 881, syll. (1922); *Cincinnati v. Hillenbrand*, 103 Ohio St. 286, syll. ¶ 2 (1921); and *Weinland v. Fulton*, 99 Ohio St. 10, syll. (1918).

Even in the mandamus litigations in which the Plaintiffs in this lawsuit have participated, the Ohio Supreme Court has reasserted this crucial holding. *See, e.g., Walker v. Husted*, 144

Ohio St.3d 361, 2015-Ohio-3749, 15 (2015); *State ex rel. Espen v. Wood Cty. Bd. of Elections*, 2017-Ohio-8223, 2017 WL 4701143 (2017).  But instead of letting Plaintiffs' duly-qualified measures appear on the ballot, the county Boards of Elections, the Secretary of State and the Ohio Supreme Court have fashioned new *ad hoc* criteria to stop proposed measures from appearing on the ballot. The rule against pre-election content-based inquiry has been swallowed by a swarm of "procedural" or "subject-matter" exceptions that ultimately deny the people their constitutional rights.

The relationship between the People (expressing their collective will in the Ohio Constitution) and the State (acting through the General Assembly) is like that of principal and agent. It must be clear that the People are the principal, and the state their agent. This relationship was explicitly recognized by the Ohio Supreme Court three years after the 1912 amendment of the Ohio Constitution to add initiative and referendum.

In 1915, the Ohio Supreme Court said, of the then-new initiative and referendum powers:

> Now, the people's right to the use of the initiative and referendum is one of the most essential safeguards to representative government. * * * The potential virtue of the 'I. & R.' does not reside in the good statutes and good constitutional amendments initiated, nor in the bad statutes and bad proposed constitutional amendments that are killed. Rather, the greatest efficiency of the 'I. and R.' rests in the wholesome restraint imposed automatically upon the general assembly and the governor and the possibilities of that latent power when called into action by the voters.

*State ex rel. Nolan v. Clendening*, 93 Ohio St. 264, 277–278, 112 N.E. 1029 (1915), quoted in *State ex rel. LetOhioVote.org v. Brunner* , 2009-Ohio-4900, ¶¶ 19-20, 123 Ohio St. 3d 322, 328, 916 N.E.2d 462, 470 (2009).

Consequently, the People have powers superior to the combined powers of the Governor and General Assembly when they initiate laws. The People have the clear "wholesome restraints"

they may exercise on the Executive and Legislative branches, including the power to create and amend county and city charters – local constitutions. But despite being constitutional powers, the General Assembly and the courts prefer to treat these constitutional powers as if they are gifts bestowed by the state and so despite the express constitutional text ironically, they do not provide cognizable constitutional protection. The People's reserved legislative powers are expressly provided for in the state constitution. There is no higher authority in state law, yet those constitutional provisions are now mere paper rights. They have become quaint because of the Defendants' assumed power to deny the people a vote on duly-qualified county charters, charter amendments, or municipal ordinances.

How did things reach a point where express constitutional provisions are worth less than the paper they were written on? Professor Harvey Walker believes "there is a clearly discernible tendency on the part of the courts to undermine the solid foundations which the cities thought they had secured through the grant of municipal home rule." Harvey Walker, *Toward a New Theory of Municipal Home Rule*, 50 Northwestern U. L. Rev. 571, 574 (1955). He observed that despite broad language in state constitutions on powers of local self-government (*e.g.*, Ohio Const. Art. XVIII, § 3,[1] §7[2]) "[t]he reasons for the antipathy of the judiciary toward urban self-determination seem to rest on several bases: 1. Historical [through viewing cities as equivalent to crown-chartered corporations subservient to the King, and then after the American Revolution,

---

[1] Titled "Municipal Powers of Local Self-Government," this section, enacted in 1912, provides in full: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

[2] Titled "Home Rule; Municipal Charter," this section, also enacted in 1912, provides in full: "Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government."

subservient to the state legislatures]. 2. Theoretical [through assuming that there can be only one ultimate source of power in the state: the legislature]. 3. Educational [through "overemphasiz[-ing] the historical line of decisions which resulted in the enunciation of Dillon's Rule . . ."]. 4. Common Law Doctrines [whereby courts rely on prior decisions rather than the constitutional texts concerning local power]." *Id.* at 575-78.

Plaintiffs thus face both an anti-local and an anti-democracy bias in how courts interpret the constitutional powers of local governments, because here the local lawmaking is done by the people themselves. It's the role of the courts to tell the people only the "constitutionality, rather than prudence,"[3] of the form of their governance – to interpret the People's Constitution as the People intended it. In Ohio, the state Supreme Court has indeed interpreted the state Constitution as making the ballot a public speech forum for initiatives.  Consequently, the wording and substance of the initiative itself is indelibly a component of the political discourse that surrounds an initiative effort, and is owed First Amendment protection.

**B. Defendant Has Caused Repeated First Amendment Violations**

Defendant BOE insists that "[w]hile the First Amendment protects the political discourse that surrounds an initiative effort (*e.g.* communication between circulators and electors), it does not protect the ability to make law by initiative, nor grant the right to speak through the state's ballot." MJOP at 4. That conclusion does not account for the circumstances pertaining in Ohio, where, as Plaintiffs have explained, the Ohio Supreme Court's dozens of interpretations hold that the ballot is a public speech forum for initiatives.

---

[3]As the Court itself admits, "But the question in front of the Court is the constitutionality, rather than prudence, of Ohio's pre-enactment review of initiative petitions." ECF No. 69,  (hereinafter "Opinion and Order") at 20.

Medina BOE cites *Marijuana Policy Project v. U.S.*, 304 F.3d 82 (D.C. Cir. 2002) in support of its point. But examination of the operative facts is appropriate.

Under the federal Home Rule Act, Congress delegated some, but not all, of its Article I "exclusive" legislative authority over the District of Columbia to the D.C. City Council. But the "Barr Amendment" (named for its sponsor, Congressman Bob Barr) states that only Congress and not the District Council can reduce marijuana penalties, making such reductions, in the words of the Home Rule Act, not a "rightful subject[] of legislation." Since marijuana penalty reductions may not be legislated by Council, they also may not be legislated by the people of the District, either. That is what the D.C. Circuit held: that the Barr Amendment's limitation on local legislative power extends not only to the D.C. Council, but also to the ballot initiative process, which it called "a power of direct legislation by the electorate," The Court noted that as initiators of legislation, the people "do not seek to make wishes known to government representatives but instead to enact change by bypassing their representatives altogether." *Id.* at 85 (citation omitted). The Barr Amendment, the D.C. Circuit, ruled, "thus denies D.C. voters any authority to step into the D.C. Council's shoes and reduce marijuana penalties themselves."

The situation in Ohio stands in sharp contrast, where the century-long rule is that Ohio's voters have complete freedom to legislate as they wish on any subject. The D.C. Circuit found the First Amendment did not to restrict Congress's ability to limit the District's authority to legislate, via Council action or direct democracy. But the Court here must deal with Ohio law, which does not deny anyone the authority to initiate, vote on, and enact into law a proposal on any subject. Ohio's initiative process is, throughout, "core political speech" that must be subjected to strict scrutiny.

Plaintiffs came to this Court for the purpose of having it consider the General Assembly's adamant, secretive passage of legislation that is unconstitutional both on its face and when enforced by the Defendants state election officials. The enforcement of HB 463 and the statutes under challenge over the course of multiple initiative campaigns is inescapably a recurring violation of 100 years of Ohio Supreme Court interpretations of the Ohio Constitution. They hope that in so doing, the legislative enactments and arbitrary obstacles erected by both State and County elections officials deny Plaintiffs due process and violate their rights of free speech, assembly, and petition for redress of grievances. Ohio's courts have refused to hear these issues in anything but expedited mandamus proceedings, thus providing no chance for a more discursive review in the state courts.

The U.S. Constitution does not require a state initiative process, but it does require that a state initiative process does not violate the First and Fourteenth Amendments. *Meyer v. Grant*. 486 U.S. 414, 415, syll., 100 L.Ed.2d 425 (1988) ("[T]he power to ban initiatives entirely does not include the power to limit discussion of political issues raised in initiative petitions"); *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring) ("The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind. . . . ").

In Ohio, executive or judicial officials may not interfere in the legislative process of the General Assembly by preventing a vote on a bill. This Court must step in to keep that from happening to the people's legislative process.

**C. The Defendant Board of Election Engages In Context-Based Prior Restraint Of Political Speech When It Denies A Duly-Qualified Initiative A Place On The Ballot**

The Medina BOE argues (MJOP at 6) that

> The pre-screening of the proposed Medina County charter to determine whether the proposed county charter petition falls within the scope of the county's authority to enact via initiative, including whether the petition conforms to the requirements set forth in Section 3 of Article X of the Ohio Constitution does not implicate the First Amendment. Plaintiff's do not possess a First Amendment right to place on the ballot an amendment to the county charter that exceeds the requirements of what the voters are permitted to enact. As a result, the Plaintiffs do not have a First Amendment Right claim, whether characterized as "facial" or as "applied" against the Medina County Board of Elections.

Plaintiffs disagree; the Ohio statutory regulations are not neutral in intent or application. Those statutes prompt governmental scrutiny and confer a discretionary power upon the Boards of Election to engage in pre-election censorship. BOEs are to decide "Whether the petition falls within the scope of a county's authority to enact via initiative," which entails quite a laundry list, including "whether the petition conforms to the requirements set forth in Section 3 of Article X of the Ohio Constitution, including the exercise of only those powers that have vested in, and the performance of all duties imposed upon counties and county officers by law, and whether the petition satisfies the statutory prerequisites to place the issue on the ballot." O.R.C. § 3501.38(M)(1)(b). This is quasi-judicial review of a *proposed* law. The statute is not value-neutral at all. It amounts to a contrivance by which Executive Branch boards of election are directed to sniff out contents within an initiative that would change or counter pre-existing law and then, to utter a subjective value judgment as to whether such alterations of existing law are consonant with BOE members' opinions of what Ohio law supposedly says. Moreover, that BOE value judgment is handed down in a hurried pre-election atmosphere when the most that can be expected of courts is anecdotal mandamus review set, in the Ohio Supreme Court, to the tempo of hyper-accelerated briefing in the form of three-day briefing increments (weekends included). In practice, the ostensibly value-neutral statutory regulation further heightens the pressures of this lock-step Executive Branch veto with an all-or-nothing feature whereby the slightest offending

phraseology in the initiative dooms the entire proposal, irrespective of whether the proposal contains a severability clause.

Viewed against the backdrop and context of a century's worth of Ohio Supreme Court pronouncements prohibiting such an abusive pre-election substantive veto, the Medina County BOE's application of O.R.C. § 3501.38(M)(1)(b) to Plaintiffs' county charter proposal embodies the Ohio General Assembly's crippling of a constitutional hallmark. Boards of Elections are free to act as an Executive Branch foil to destroy any county charter proposal that the BOE members decide – inconsistently and subjectivity – fails to live up to whatever conditions they think important. This content-based evaluation by BOEs renders the Article I, § 2 initiative power a quaint legal nullity. The General Assembly has unlawfully delegated pre-election content analysis of initiatives to unqualified election officials, allowing them to interdict politically controversial measures. Proposals that offend local political elites are easily denied a place on the ballot, and the measure's proponents' are left with only mandamus recourse to the courts. This derogates the precept that "An unconstitutional amendment may be a proper item for referendum or initiative." *State ex rel. Youngstown v. Mahoning Cty. Bd. of Elections*, 144 Ohio St.3d 239, 2015-Ohio-3761, 41 N.E.3d 1229, ¶ 11. The Court continued, "Such an amendment becomes void and unenforceable only when declared unconstitutional by a court of competent jurisdiction. Any other conclusion would *authorize a board of elections to adjudicate a constitutional question and require this court to affirm its decision even if the court disagreed with the board's conclusion on the underlying constitutional question, so long as the board had not abused its discretion*." *Id.* (emphasis added).

**D. Ohio's Ballot Access Scheme Prevents Plaintiffs From Associating
For Political Change By Creating Executive And Judicial Veto Power**

Defendant Medina BOE has not articulated any interests that could justify the burdens imposed by HB 463 that could survive strict scrutiny or any other standard of review under the First and Fourteenth Amendments.

The statute comprises a prior restraint on initiative petitioners' right to speak about political issues and to associate with others for political ends. O.R.C. § 3501.38(M)(1)(b) commands evaluation of content in a pre-election time frame and thus is a barrier to core political speech. It is a prior restraint on speech.

The Supreme Court has articulated three procedural safeguards necessary for a system of prior restraint to survive constitutional challenge:

> First, the decision whether or not to grant a license must be made within a specified, brief period, and the status quo must be preserved pending a final judicial determination on the merits. Second, the licensing scheme must also assure a prompt judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license. Third, the licensing scheme must place the burden of instituting judicial proceedings and proving that expression is unprotected on the licensor rather than the exhibitor.

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001) (citing *Freedman v. Maryland*, 380 U.S. at 57-59, 85 S.Ct. 734) (internal citations and quotation marks omitted).

House Bill 463's mandatory scrutiny of initiative measures for censorable content does not allow for preservation of the *status quo* pending a final judicial determination on the merits, nor a prompt judicial determination to timely correct abusive exercise of BOE discretion. O.R.C. § 3501.38(M)(1)(b) assigns the burden of going to court and proving that the initiative may lawfully be placed on the ballot upon the proponents of the initiative.

Hitherto, the Court has analyzed the HB 463 scheme only as process, when in fact the statutes oblige boards of election to dive directly into the contents of initiative proposals and execute a complicated analysis of sifting, weighing, and speculation, all directed at producing a probabilistic assessment of the lawfulness of a proposed measure as filtered through the BOE's unstandardized comprehension of Ohio law. That complicated process will yield a stream of censorious decisions from the Executive Branch which, by virtue of the limited pre-election time to decide, plus the limited mandamus remedy, eviscerates the longstanding role of the courts. Election authorities in Ohio are not merely managing how measures are placed before the public. The Secretary of State and BOEs are ordered by the General Assembly to ferret out initiatives that would legislate change. Because they would change the *status quo*, any argument concerning their unconstitutionality, if adopted by 3 votes of a Board of Elections suffices to snuff the use of initiated county charters despite the nature of initiative as a core speech and democracy right.

When the *Anderson-Burdick* analysis is applied to the Ohio ballot scheme, HB 463 cannot be sustained. The three-step framework weighs the character and magnitude of the burden the State's rule imposes on Plaintiffs' First Amendment rights against the interests the State contends justify that burden, and considers the extent to which the State's concerns make the burden necessary. The three *Anderson-Burdick* [4] steps are as follows:

> The first, most critical step is to consider the severity of the restriction. Laws imposing severe  burdens on plaintiffs' rights are subject to strict scrutiny, but lesser burdens trigger… less  exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. Regulations that fall in the middle warrant a flexible analysis that weighs the state's interests and chosen means of pursuing them against the burden of the restriction. At the second step we identify and

---

[4]Derived from the Supreme Court's holdings in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*  504 U.S. 428 (1999).

evaluate the state's interests in and justifications for the regulation. The third step requires that we assess the legitimacy and strength of those interests and determine whether the restrictions are constitutional.

Also, the Sixth Circuit has stated that "[t]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016).

In this case, the Medina County BOE has repeatedly excluded Plaintiffs' initiatives from the ballot, and the Plaintiffs have alleged in the Complaint numerous examples of how other BOE Defendants and the Secretary of State have collusively excluded proposed charter amendments from the ballot. These include situations where Defendants have engaged in unlawful reviews of the substance of proposed charter amendments to exclude proposed initiatives from the ballot, and the use of pre-enactment substantive review to preclude controversial measures from the ballot and to curtail campaigning that debates the measures throughout the period from wrongful ballot exclusion to election day.

Oddly, while the Court cited the *Grimes* assessment that the "hallmark of a severe burden is exclusion or virtual exclusion from the ballot," it proceeded to find that "Plaintiffs, however, have not been burdened with exclusion or virtual exclusion from participating in the election process. Rather, they have been restricted from placing initiatives on the ballot that were determined by state officials to exceed the scope of legislative authority." Opinion and Order at 18. The Court mistakenly sees the exclusion of Plaintiffs' initiatives from the ballot as the product of rote procedural rulings by boards of election or the secretary of state instead of what they are, case-by-case content-weighing judgments which then allow "exclusion. . . from the ballot." This is not the same as the BOE determining that an initiative petition failed to gather

sufficient signatures, which is a clear factual determination of the kind appropriate for the BOE. Instead, and at issue here, the General Assembly, through HB 463, has purported to give BOEs the power to conduct judicial review of a proposed measure pre-election and thereby determine whether it is excluded from the ballot.

Plaintiffs, the Court continues, "remain free to exercise the initiative power in compliance with Ohio's initiative ballot statutes." Opinion and Order at 18. But what Plaintiffs "remain free to exercise" is participation in an egregious guessing game of how a particular majority of elections officials will interpret such things as local government powers and pre-emption. The Court erroneously believes that "Plaintiffs offer nothing more than conclusory allegations that the ballot initiative statutes were applied based on content." Plaintiffs are not conclusionary or failing in any evidentiary respect; the challenged statutes *order* unqualified elections officials to determine whether a county charter proposal "conforms to the requirements set forth in Section 3 of Article X of the Ohio Constitution, including the exercise of only those powers that have vested in, and the performance of all duties imposed upon counties and county officers by law, and whether the petition satisfies the statutory prerequisites to place the issue on the ballot."

Plaintiffs' proofs are conclusive evidence; they are expressed in the statutory commands themselves. On its face, the statutory scheme mandates content analysis by elections officials before an initiative can go to the ballot. The sole allowable "engagement in political expression" left to Plaintiffs, then, is an impossible shell game where the People must guess what content in an initiative petition will finally be acceptable to the election agency commissariat for it to proceed to the ballot. While it wouldn't clear up the enormous constitutional defects in this process, the General Assembly has omitted from the legal checklist in § 3501.38 the command of

obedience to the century of Ohio Supreme Court jurisprudence against content vetoes. That should be seen as an ominous signal that the legislature has arrogantly usurped the Ohio Constitution.

The Court places a surprising degree of confidence in nonjuridical, untrained elections regulators as the final arbiters of what comprises the "scope of state law," before the election, instead of the courts, post-election.

**E. Incorporation By Reference As To Counts Six, Seven and Eight**

In response to Medina County BOE's arguments for dismissal of Counts Six, Seven and Eight of the Complaint, Plaintiffs hereby incorporate fully herein by reference their arguments appearing on pp. 9-13 of ECF 76, "Plaintiffs' Response to Defendant Portage County Board of Elections' Motion to Dismiss."

**F. Conclusion**

The Plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face" against the Medina County BOE. *Traverse Bay Area Immediate Sch. Dist. v. Mich. Dep't of Educ.,* 615 F.3d 622, 627 (6th Cir. 2010). Therefore, Defendant's motion should be denied.

**WHEREFORE**, Plaintiffs pray the Court deny the Medina County Board of Elections' Motion for Judgment on the Pleadings in its entirety.

><em>/s/ Terry J. Lodge</em>
>Terry J. Lodge, Esq.
>316 N. Michigan St., Suite 520
>Toledo, OH 43604-5627
>(419) 205-7084
>tjlodge50@yahoo.com

/s/ Lindsey Schromen-Wawrin
Lindsey Schromen-Wawrin, Esq.
Shearwater Law PLLC
306 West Third Street
Port Angeles, WA 98362
lindsey@ShearwaterLaw.com
(OpenPGP key available)
phone: (360) 406-4321
Co-Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2020, I deposited a copy of the foregoing Memorandum Response in Opposition into the Electronic Case Filing system maintained by the Court, and that according to protocols of the system, it was electronically served upon all counsel registered to receive electronic filings.

/s/ Terry J. Lodge
Terry J. Lodge, Esq.
Co-Counsel for Plaintiffs