1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

SUSAN BEIERSDORFER,            )
et al.,                        )   Case No. 4:19-cv-260
                               )   Youngstown, Ohio
            Plaintiffs,        )   Monday, August 26, 2019
                               )   1:09 p.m.
      vs.                      )
                               )
FRANK LaROSE, et al.,          )
                               )
            Defendants.        )

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE BENITA Y. PEARSON**
**UNITED STATES DISTRICT JUDGE**

**MOTION HEARING**

**APPEARANCES:**

**For the Plaintiffs:**
       Terry J. Lodge, Esq.
       Suite 520
       316 North Michigan Street
       Toledo, Ohio  43604
       (419) 205-7084
       tjlodge50@yahoo.com

**MARY L. UPHOLD, RDR, CRR**
Thomas D. Lambros Federal Building and U.S. Courthouse
125 Market Street, Room 337
Youngstown, Ohio  44503-1780
(330) 884-7424
Mary_Uphold@ohnd.uscourts.gov

Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES (CONTINUED):**

**For the Defendant Ohio Secretary of State Frank LaRose:**
    Office of the Attorney General - Constitutional
    Offices, State of Ohio
    **By:**  Renata Y. Staff, Esq.
    16th Floor
    30 East Broad Street
    Columbus, Ohio  43215
    (614) 466-2872
    renata.staff@ohioattorneygeneral.gov

    Office of the Attorney General - Constitutional
    Offices, State of Ohio
    **By:**  Julie M. Pfeiffer, Esq.
    16th Floor
    30 East Broad Street
    Columbus, Ohio  43215
    (614) 466-2872
    julie.pfeiffer@ohioattorneygeneral.gov

**For the Defendants Mahoning County Board of Elections**
**Members in their official capacities:**
    Office of the Prosecuting Attorney, Mahoning County
    **By:**  Sharon K. Hackett, Esq.
    120 Market Street
    Youngstown, Ohio  44503
    (330) 740-2330
    shackett@mahoningcountyoh.gov

**For the Defendants Lucas County Board of Elections Members**
**in their official capacities:**
    Office of the Prosecuting Attorney - Lucas County
    **By:**  Kevin A. Pituch
    700 Adams Street
    Toledo, Ohio  43604
    (419) 213-2001
    kpituch@co.lucas.oh.us

**For the Defendants Portage County Board of Elections Members**
**in their official capacities:**
    Office of the Prosecuting Attorney - Portage County
    **By:**  Christopher J. Meduri, Esq.
    241 South Chestnut Street
    Ravenna, Ohio  44266
    (330) 297-3850
    cmeduri@portageco.com

1    **APPEARANCES (CONTINUED):**

2    **For the Defendants Franklin County Board of Elections**
     **Members in their official capacities:**
3        Office of the Prosecuting Attorney - Franklin County
         **By:**  Timothy A. Lecklider, Esq.
4        13th Floor
         373 South High Street
5        Columbus, Ohio  43215
         (614) 525-3520
6        tlecklider@franklincountyohio.gov

7    **Also present:**

8        Tish O'Dell, Paralegal for Terry J. Lodge, Esq.

9        Patrick J. Piccininni, Chief Ethics Officer and
         Compliance Counsel for Ohio Secretary of State
10                                   - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

- - -

THE CLERK:  The matter before the court is Case
Number 4:19-cv-260, Beiersdorfer versus LaRose.

THE COURT:  Thank you all for standing.  Please
feel free to retake your seats.

Counsel for plaintiffs, will you please introduce
yourself and the person seated with you at counsel's table?

MR. LODGE:  Yes.  Thank you, Your Honor.  I'm
Terry Lodge.  I'm counsel for all of the plaintiffs.  And I
might point out that many of the actual named plaintiffs are
present today.

Along with me is Tish O'Dell, who is serving as my
paralegal.

THE COURT:  Welcome to you all.

On behalf of the defense, will you please
introduce yourselves for the record and anyone accompanying
you here to court today?

MS. STAFF:  Good afternoon, Your Honor.  Assistant
Attorney General Renata Staff.  I'm here today on behalf of
Ohio Secretary of State Frank LaRose.  And I have with me
our client representative Patrick Piccininni.  I'm also
accompanied by co-counsel, Julie Pfeiffer.

THE COURT:  Welcome to you all as well.

MS. STAFF:  Thank you, Your Honor.

5

1          THE COURT:  Lucas County?

2          MR. PITUCH:  Yes, Judge.  Kevin Pituch here on

3     behalf of Lucas County Board of Elections.

4          THE COURT:  Welcome, sir.

13:12:02  5          MS. HACKETT:  And Sharon Hackett on behalf of the

6     Mahoning County Board of Elections members.

7          THE COURT:  Thank you all for appearing, and I am

8     prepared to hear your arguments.  I'm sure you understand

9     from the order I issued, it's docketed as ECF Number 62,

13:12:19 10     that I've given each side an hour.  And I'd like to know

11     what you've decided is the best way to make use of that

12     time.

13          I imagine that there might be some sharing among

14     the defense, but will you tell me?

13:12:34 15          MS. STAFF:  Yes, Your Honor.  At this point, we

16     are planning to allocate time with myself taking probably

17     the first 15 minutes or so on behalf of the Ohio Secretary

18     of State, and then the remaining defendants will be

19     splitting the rest of the time between them.  We don't

13:12:48 20     anticipate taking longer than 45 minutes or so between the

21     three of us, depending on the court's questions.

22          THE COURT:  Thank you.  And am I to believe that

23     you've arranged your presentations to avoid any unnecessary

24     overlap?

13:13:05 25          MS. STAFF:  Your Honor, I would propose taking the

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

6

1   First Amendment issues from the beginning, and then I would

2   be happy to address any additional questions regarding the

3   remainder of plaintiffs' complaint and the rest of the

4   counts in those complaints.

13:13:17  5       I believe several of the other defendants have

6   their own arguments they will be making.

7       THE COURT:  Mr. Pituch?

8       MR. PITUCH:  Yes, Judge.  Because the motion

9   filed -- that I filed on behalf of the Lucas County Board of

13:13:34  10  Elections is virtually identical to that filed by the

11  Secretary of State, Ms. Staff will be handling not only her

12  argument, but probably mine as well depending on what she

13  says.  It's the same motion.

14      THE COURT:  Understood.

13:13:47  15      MS. HACKETT:  And Mahoning County's motion to

16  dismiss was based on some additional factors, and so we'll

17  be addressing those shortly, though.

18      THE COURT:  All right, then.  Let me ask this.

19  And, Mr. Lodge, I don't intend to leave you out, but this

13:14:02  20  goes back to the defense table.  You have the motions

21  pending, the motions to dismiss and the motions for a

22  judgment on the pleading.  It's my expectation that you'll

23  go first.  Is that your hope as well?

24      MS. STAFF:  Yes, Your Honor.

13:14:14  25      THE COURT:  And am I to expect only argument, or

7

1   will there also be some attempt to proffer or present

2   evidence?

3           MS. STAFF:  My presentation is limited only to

4   argument, Your Honor.

13:14:24  5           THE COURT:  All right, then.  Same for each of

6   you?

7           MS. HACKETT:  Yes, Your Honor.

8           MR. PITUCH:  Yes, Judge.  It's a 12(c) motion.  I

9   think evidence would be actually improper.

13:14:33  10          THE COURT:  Well, I said proffer or present,

11  meaning PowerPoint or anything of that sort.

12          MR. PITUCH:  Oh, no.

13          THE COURT:  But you don't have anything like that

14  in mind?

13:14:42  15          MR. PITUCH:  No, Judge.

16          MS. HACKETT:  No, Your Honor.

17          THE COURT:  All right.  Mr. Lodge, how would you

18  like to use your time?  The one question I haven't put to

19  the defense is if each side would like to make some opening.

13:14:55  20  I'll tell you, I don't know that that would be a good use of

21  your time because I will subtract.

22          I've read what's been filed including the

23  supplemental filings.  As you know, I've had an opportunity

24  with you in chambers to speak with you.  So I think I'm well

13:15:09  25  prepared to hear what you'll share.  But if you have a

8

1  burning desire to make some brief opening because it might

2  be a while before I hear from you more fully, I'll indulge

3  it.

4  MR. LODGE:  Thank you for the invitation, Your

13:15:23  5  Honor, but I am confident that we can handle things in more

6  the customary fashion in motion arguments.

7  And I am -- I don't know if the court is going to

8  be very formalistic or if there's going to be sort of a

9  surrebuttal opportunity.  If the court is entertaining that,

13:15:43  10  I would prefer to reserve about ten minutes of the hour for

11  that purpose.

12  THE COURT:  Sure, but let me advise you, you're

13  your own timekeeper.  Meaning what I'll do is count to 60

14  and once you've reached it, you're done.  So if I were you,

13:16:00  15  I would stop at 50, right?

16  Is that part of Ms. O'Dell's responsibility?

17  MR. LODGE:  Yes.

18  MS. O'DELL:  I will go up and pull his coat.

19  THE COURT:  Fair enough.  And the court security

13:16:09  20  officer will not stop you.

21  MS. O'DELL:  Thank you.

22  THE COURT:  All right, then.  With that,

23  Ms. Staff, if you're ready, I am prepared to hear you.  Same

24  thing for the defense.  Keep your time.

13:16:23  25  MS. STAFF:  Thank you, Your Honor.

1          I am Assistant Attorney General Renata Staff, and

2     I am here today on behalf of Ohio Secretary of State Frank

3     LaRose.  And, Your Honor, and may it please the court,

4     plaintiffs' complaint here lacks an essential component, any

13:16:40  5     claim for which this court may grant them relief.

6          Here, the very recent Schmitt versus LaRose

7     decision decides plaintiffs' First Amendment claims and

8     warrants dismissal of their complaint.  Here --

9          THE COURT:  You don't disagree, I believe that's

13:16:57  10    the case, with what plaintiff points out?  Schmitt only went

11    so far.  For instance, it denied as moot the as applied

12    challenges.  And the complaint before me has both facial as

13    well as as applied challenges.

14         MS. STAFF:  Yes, Your Honor is absolutely correct

13:17:16  15    that the complaint before you has both facial and as applied

16    challenges.  And here, Your Honor, the plaintiffs tried to

17    avoid the result in Schmitt, which is the fact that these

18    laws are constitutional under the First Amendment, by making

19    several other arguments.  They argue that their as applied

13:17:34  20    challenges should survive the facial dismissal.

21         But, Your Honor, plaintiffs' facial and as applied

22    challenges are exactly the same.  They're based on the exact

23    same First Amendment theories, and they seek the exact same

24    relief.  They are substantively --

13:17:55  25         THE COURT:  Can I ask, then, would it be fair, if

1    I understand you, to say that my analysis and conclusion

2    regarding the as applied challenges in the complaint before

3    me would also be dispositive of the facial challenges before

4    me?

13:18:08    5            MS. STAFF:  That's correct, Your Honor.  And if I

6    may, there were similar arguments made to the ones

7    plaintiffs are trying to press here in the CITL versus

8    Ballot Board case before Judge Graham in the Southern

9    District of Ohio.

13:18:23   10            In there plaintiffs argued against a motion to

11   dismiss filed by the state saying that they had brought both

12   facial and as applied challenges to a statewide initiative

13   law.

14            And Judge Graham looked at the complaint and

13:18:36   15   looked at the state's motion to dismiss and found that the

16   plaintiffs had failed to meaningfully distinguish their as

17   applied challenge from the facial challenge in their

18   complaint.

19            And because the plaintiffs didn't distinguish any

13:18:51   20   part of their claim that should survive as an as applied

21   challenge, the court said he would not do so there.

22            And the result here, Your Honor, should be the

23   same.  Plaintiffs did not at all distinguish their as

24   applied from their facial challenges.  They seek wholesale

13:19:07   25   invalidation of these laws.  They do not seek any specific

1    relief as applied to the particular plaintiffs.  And their

2    as applied challenges fail for the same reason as their

3    facial challenges, and that's because these ballot

4    initiative laws survive and do not offend the First

5    Amendment.

6          And, Your Honor, here plaintiffs raise First

7    Amendment challenges in Counts 1 through 5.  They -- as I

8    said, though, the recent decision in Schmitt versus LaRose

9    decides this case.  Ohio's laws do not violate the First

10   Amendment.

11         And applying Anderson-Burdick balancing, the Sixth

12   Circuit held that Ohio's laws are supported by substantial

13   and legitimate interests.  They further the state's interest

14   in preserving voter confidence and simplifying the ballot

15   and in avoiding voter confusion.

16         These laws are content neutral.  They do not

17   discriminate based on content.  They do not discriminate

18   based on subject matter.  They do not discriminate based on

19   viewpoint.  They are not prior restraints on speech.  They

20   do not control expressive activity.  They are reasonable

21   state regulations of ballot access laws.  They do not offend

22   the First Amendment.

23         Schmitt resolves this case and requires dismissal

24   of these First Amendment claims.

25         And, in fact, Your Honor, on that content-based

1    point, plaintiffs actually conceded, like the Schmitt

2    plaintiffs did, that they don't claim they have an absolute

3    right to legislate about any particular topic of their

4    choosing.  That was the same concession that the Schmitt

5    plaintiffs made, and the court relied on that as well as

6    their own analysis and found that these laws are content

7    neutral.

8         These laws are also content neutral based on the

9    relative burdens here, Your Honor.  You will likely probably

10   notice that the plaintiffs here attempt to distinguish

11   Schmitt based on the burden analysis.  They argue that

12   somehow Schmitt didn't consider all of the burdens that they

13   may have been subjected to.  But that's simply not the case

14   here.

15        Plaintiffs here claim that their only burdens come

16   from the content-based substantive pre-enactment review of

17   proposed ballot measures.  Those are the exact same claims

18   that the Schmitt court considered and rejected in turn.

19   Again, these are not content-based laws, they are not prior

20   restraints on speech.

21        I would also, you know --

22        THE COURT:  But let me just ask you to pause there

23   for a moment, because I don't disagree that plaintiff has

24   made an argument similar to the one you've just summarized,

25   and suggest that maybe the court's response should be a

13

1    bright-line rule, basically some clear prohibition against

2    pre-enactment review.

3              What's your direct response to that?

4              MS. STAFF:  There's simply no legal basis for

13:22:17    5    that, Your Honor.  These laws, the Sixth Circuit held, are

6    reasonable state regulations of ballot access.

7              THE COURT:  I think Judge Bush considered them

8    gatekeeper laws, and I think another term used throughout

9    Schmitt was legislative authority rules, or something of

13:22:37    10   that sort, right?

11             MS. STAFF:  Yes, Your Honor, that's correct.  And

12   that's in -- these laws do facilitate these substantial and

13   legitimate state interests of ensuring that these issues

14   that don't meet threshold eligibility requirements for the

13:22:54    15   ballot do not appear on the ballot, and then later on, after

16   everyone has voted on them, have to go through a number of

17   legal challenges only to end up being invalidated.

18             So, yes, these --

19             THE COURT:  Do you think there could be any

13:23:10    20   disturbance in the confidence voters have in the ballot if

21   there is this later review and later determination that

22   something was on the ballot that should not have been?

23             MS. STAFF:  Of course, Your Honor.  You know, it

24   would certainly create chaos for people if they do vote on

13:23:26    25   these issues, if they go to the polls, consider the issues

14

1    that are on the ballot and believe that the issues they have

2    voted on do meet threshold requirements to actually appear

3    on the ballots, only later to find out, after voting, after

4    taking the time to educate themselves, that they do not meet

13:23:45  5    these threshold requirements.  There is certainly a huge

6    impact, I would think, on voter confidence in the items that

7    appear on the ballot.

8         And, of course, Your Honor, the Sixth Circuit

9    found that these laws do facilitate these substantial and

13:24:01 10    legitimate interests in ensuring voter confidence and

11    reducing voter confusion, also ensuring a simplified ballot,

12    a ballot that's not cluttered with issues that may

13    ultimately be found to not have met these threshold

14    requirements.

13:24:20 15         And, Your Honor, at one point in their briefing,

16    plaintiffs also suggest that at this stage in the

17    litigation, it's simply not appropriate to consider the

18    Anderson-Burdick balancing at the motion to dismiss stage.

19    And again, Your Honor, that's not the case.

13:24:38 20         The Sixth Circuit has affirmed dismissals of First

21    Amendment challenges to election laws where plaintiffs'

22    arguments fail as a matter of law.  And the example there is

23    the CITL versus Ballot Board case, where the Sixth Circuit

24    affirmed a dismissal by Judge Graham in the Southern

13:24:57 25    District to a First Amendment challenge involving a

15

1    state-wide initiative law.

2         And in that particular holding, the Sixth Circuit

3    also cited to other cases where they have similarly affirmed

4    dismissals under the Anderson-Burdick analysis, including

13:25:12  5    the Lawrence versus Blackwell case and the Taxpayers United

6    for Assessment Cuts versus Austin case.

7         And, Your Honor, I would be also happy to speak

8    about the remaining counts aside from the First Amendment

9    issues that plaintiffs have --

13:25:28  10         THE COURT:  Well, I strongly suggest you take this

11    opportunity, because as I read the motion to dismiss, it

12    addresses all, not just Counts 1 through 5.

13         MS. STAFF:  That's absolutely correct, Your Honor.

14         THE COURT:  So if you have anything more you'd

13:25:39  15    like to say about 6, 7 or 8, I'll certainly hear it.

16         MS. STAFF:  Okay.

17         THE COURT:  But don't feel that you need to go on

18    longer than necessary.

19         MS. STAFF:  Okay.  Thank you very much, Your

13:25:48  20    Honor.

21         Plaintiffs' Count 6 here raises a substantive due

22    process claim.  This claim fails under the two methods for

23    raising such a claim.  First, these laws do not violate any

24    particular constitutional guarantee.  They do not violate

13:26:02  25    any fundamental constitutional right.

16

1          And from the outset, this is because there is no

2  recognized fundamental constitutional right to local

3  self-government.  Plaintiffs acknowledge the lack of case

4  precedent for this particular position.  And so this law

13:26:17  5  cannot -- these laws cannot be invalidated under that

6  particular method.

7          Under the second method for considering

8  substantive due process claims, plaintiffs simply failed to

9  state a claim.  These laws do not shock the conscience.

13:26:32  10  That is an incredibly high threshold, as the court is well

11  aware.

12          And in here there are simply no allegations that

13  would lead to the conclusion that these laws are so

14  egregious, so outrageous that they would fairly be said to

13:26:45  15  shock the contemporary conscience.  There's absolutely no

16  pleading to that effect.  And in fact, Your Honor, the Sixth

17  Circuit held these laws to be constitutional.

18          With respect to plaintiffs' Count 7, they raise a

19  Ninth Amendment challenge to these ballot initiative laws.

13:27:00  20  And plaintiffs on that point also acknowledge the lack of

21  case authority supporting that particular claim.  As courts

22  have recognized, there's no independent cause of action that

23  comes with the Ninth Amendment.

24          THE COURT:  And doesn't Count 7 rise and fall with

13:27:14  25  Count 6?

1          MS. STAFF:  Yes, Your Honor.  Here there's just no

2     constitutional guarantee that speaks to the local

3     self-government right that plaintiffs are trying to press

4     here.  That's absolutely right, Your Honor.

13:27:28  5          And with respect to their Count 8, this court

6     simply has no jurisdiction over plaintiffs' separation of

7     powers claim that arises exclusively under Ohio's

8     Constitution.

9          As the court is well aware, federal courts lack

13:27:44  10    jurisdiction over the state law claims against state

11    officials sued in their official capacities.

12          Your Honor, state courts are in the best place to

13    resolve these state law questions.  And there is simply no

14    jurisdiction for the court to consider this particular

13:27:59  15    claim.

16          THE COURT:  So I haven't overlooked some waiver

17    made by the State of Ohio?

18          MS. STAFF:  I apologize, Your Honor?

19          THE COURT:  There hasn't been a waiver?

13:28:07  20          MS. STAFF:  No, absolutely not.  There has been no

21    waiver on these particular issues.  You have not overlooked

22    anything here.

23          Even taking plaintiffs' pleaded facts as true,

24    these claims in Counts 1 through 8 fail as a matter of law,

13:28:24  25    and it's the state's position, the Secretary of State's

18

1    position that this complaint should be dismissed under both

2    Rule 12(b)(6) and 12(b)(1).

3         And unless the court has any further questions, I

4    would cede the remainder of my time to the remaining

13:28:39  5    plaintiffs -- or defendants here.

6         THE COURT:  Thank you.  I'd appreciate that.  I'm

7    sure they will as well.  Thank you, Ms. Staff.

8         MS. STAFF:  Thank you, Your Honor.

9         THE COURT:  Mr. Pituch, if you're next.

13:28:50  10         MR. PITUCH:  Good afternoon, Judge.

11         THE COURT:  Good afternoon, sir.

12         MR. PITUCH:  Briefly, I just want to touch on a

13    point that was raised in the supplemental brief filed by the

14    plaintiffs and point out that when a board of elections

13:29:07  15    looks at an election, there are a variety of ways they can

16    keep either candidates or issues off of the ballot.  This

17    case only concerns not candidates, but certain issues.  And

18    actually, there's one issue I think, Judge, that you no

19    longer really need be concerned about.

13:29:22  20         There are three things raised in the complaint.

21    One has to do with the board perhaps keeping a proposed

22    charter, a county charter off the ballot.  Another one is a

23    proposed municipal initiative, where the city, through its

24    voters, enacts law.  And the third thing is a municipal

13:29:40  25    charter amendment.

19

1          Prior to October of 2018, the board had the -- not

2     only the -- it actually had the obligation to keep all three

3     of those off the ballot if they were deemed to be

4     administrative rather than legislative.  However, the

13:30:00    5     Supreme Court changed the law last October, and it -- in

6     terms of the charter amendments.  It was a case actually I

7     had, Judge.  And I'm pretty sure it's cited in the briefs.

8          But now there can no longer be a preelection

9     content review of a municipal charter amendment.  That's

13:30:16   10     something the Ohio Supreme Court has said a board of

11     elections does not have the authority to engage in.

12          And actually, that's happened since that decision.

13     The Lake Erie Bill of Rights, which is one of the reasons we

14     are here today, was initially brought up to my board last

13:30:32   15     August.  We kept it off of the ballot.  It went to the

16     Supreme Court.  The Supreme Court said if any -- a board no

17     longer has the authority to keep a charter amendment off of

18     the ballot.  And if a municipal ordinance is then sent to

19     the board, it must go on the ballot.

13:30:51   20          And that's exactly what's happened this year.

21     Earlier this year there was a special election in Toledo.

22     The Lake Erie Bill of Rights went onto the ballot.

23          So I don't know that you necessarily have to

24     concern yourself in terms of preelection content review with

13:31:04   25     the charter amendment portion of the proceedings.

20

1    Everything else still stands in play.  The Supreme Court has

2    said that a board of elections does have the authority to

3    keep a municipal initiative off of the ballot if it deems

4    fit to do so.

13:31:22  5           THE COURT:  And it also still allows county

6    amendments?

7           MR. PITUCH:  Yes.  There is a proceeding right now

8    in the Ohio Supreme Court regarding a proposed county

9    charter amendment for Williams County.  That will be

13:31:31  10   addressed by the Supreme Court later -- actually more likely

11   in September.

12          THE COURT:  Is there a trend afoot?  Do you

13   believe the ruling regarding the municipal charter

14   amendment, is that the start of a trend that maybe will

13:31:49  15   counsel the courts going forward?

16          MR. PITUCH:  Well, here's what I think will

17   happen, Judge:  The Supreme Court has said the board can

18   deny ballot access to a municipal initiative, but cannot to

19   a charter amendment.

13:32:03  20          If you look at the Lake Erie Bill of Rights, it's

21   not really an initiative -- it's a -- I mean, it's not

22   really a charter amendment.  It doesn't have the -- it

23   doesn't deal with the form or structure of government.  It

24   doesn't say how many councilmen the city has or what powers

13:32:17  25   the mayor has, it's really an initiative.  It's really

1    something designed to regulate behavior.

2         But now what people will do is label their

3    initiatives charter amendments and they'll go on the ballot

4    and you'll have to be sued later.  Just like the -- right

13:32:29  5    now, as we sit here today, the Lake Erie Bill of Rights is

6    being sued as being unenforceable and unconstitutional in

7    the Northern District of Ohio.  Judge Zouhary has that case.

8    And he will make a determination later this year whether

9    that is so.

13:32:42  10        But that's what I think will happen.  So

11   notwithstanding what the court does, I think smart

12   plaintiffs will craft their ballot measure as a charter

13   amendment, knowing that a board of elections -- like when

14   the -- when the city council in our case passed the

13:32:57  15   initiative -- passed the ordinance directing us to put the

16   Lake Erie Bill of Rights on the ballot, we did so.

17        Even though we all -- even though all the board

18   members there made statements to the effect that this thing

19   is unconstitutional, can't be enforced, but yet we must put

13:33:13  20   it on the ballot, and that's exactly what they did.

21        THE COURT:  Thank you.

22        MR. PITUCH:  That's really all I have.

23        THE COURT:  All right, then.

24        MR. PITUCH:  Ms. Staff pretty much said it all for

13:33:21  25   me other than that point, Judge.

22

1              THE COURT:  Well, let me just ask this one

2       question.  And it goes to your supplemental filing.  And I

3       appreciate what all of you wrote to the court after the

4       Schmitt ruling was made public.

13:33:37   5              In yours, I appreciated that you use a style, you

6       enumerated certain points.  And I appreciated that it makes

7       it easier to follow when there's a lot of reading to be

8       done.

9              But I am wondering about your statement towards

13:33:56  10       the end.  You heard Ms. Staff, she briefly referenced Counts

11       6 through 8.  And you did as well.  You basically spent most

12       of your time on the First and the Fourteenth Amendments.

13              Would you like to say anything about Counts 6

14       through 8 of the complaint?

13:34:15  15              MR. PITUCH:  No.  The reason I submitted a

16       supplemental brief was to discuss what effect, if any,

17       Schmitt had on this case.  I don't think Schmitt had any

18       effect on the Ninth Amendment aspect of this case, the

19       substantive due process aspect of this case, or the state

13:34:30  20       law portion.  Schmitt was pretty much -- actually, they said

21       they were a First Amendment case and a Fourteenth Amendment

22       procedural due process case.

23              So that -- the only reason I mentioned that is

24       because that's -- the supplemental brief was to tell the

13:34:45  25       court, tell you why I thought Schmitt was important.

1          THE COURT:  Thank you.  And the only other

2     question I'll ask of you at this time, then, is -- and I

3     appreciate you pointing out that you hadn't relied on

4     Anderson-Burdick, but the Secretary had.

13:34:59  5          And I think what you were also saying is, "Judge,

6     we believe in hindsight Anderson-Burdick is the correct

7     analysis to be applied."  Is that also --

8          MR. PITUCH:  Yeah.  My position only got one of

9     three votes, Judge.

13:35:11 10          THE COURT:  Okay.

11          MR. PITUCH:  And I don't know that that will

12     necessarily change if the petition for en banc review is

13     granted.  I don't know if the petition will be granted, nor

14     do I know if Judge Bush's position will gain acceptance.

13:35:26 15          THE COURT:  Understood.  Thank you, sir.

16          Ms. Hackett, when you're ready.

17          MS. HACKETT:  May it please the court.  For the

18     record, I'm Sharon Hackett.

19          THE COURT:  Ms. Hackett, forgive me.  I don't know

13:35:46 20     why it keeps happening.  I manage this, or as one of my

21     colleagues calls it, flying the bench.  But today every time

22     I reach in this corner, I silence the room.  Please, I did

23     hear who you are.  I'll bet Mary did as well, so you can go

24     forward from there.

13:36:01 25          MS. HACKETT:  Thank you, Your Honor.  First of

1      all, I would like to perhaps reserve just a few minutes at

2      the end for rebuttal if need be.

3             And secondly, I wanted to make clear that we are

4      and did in our briefs rely on the Secretary of State's

13:36:17   5      arguments and the arguments of the Lucas County Board of

6      Elections with regard to the 12(b)(6) motion to dismiss.

7             And those are basically the arguments that Renata

8      and Kevin talked about today.  So I don't want to repeat

9      myself or their arguments here, but I just wanted to let the

13:36:37   10     court know that we are relying on what their arguments are

11     in regards to those issues.

12            And also, we feel that we've, you know, dealt with

13     the bulk of our arguments adequately in our briefs and I

14     don't want to take up too much of the court's time.  But I

13:36:57   15     did want to stress a couple of -- couple of matters.

16            The first of these has to do with the standing

17     issue.  And that is particularly in regard to the Mahoning

18     County defendants.  The court, as you know, has jurisdiction

19     over only live cases or controversies.  And with regard to

13:37:24   20     the Mahoning County plaintiffs and their interactions with

21     the Mahoning County defendants, all of those interactions

22     had ended well before the time that this lawsuit was filed.

23            The last time that a petition was submitted to the

24     Mahoning County Board of Elections, it was certified to the

13:37:45   25     ballot and it went to the ballot and was voted on.  There

25

1    had been -- have been no further petitions filed with the

2    Mahoning County Board of Elections.

3                And I think that there were a couple of cases

4    cited in our brief that I feel they're dispositive on that

13:38:02  5    standing issue.  And those are the Lyons -- LA versus Lyons

6    case and Renne versus Geary, which are both U.S. Supreme

7    Court cases that talk about particularly the imminent threat

8    of imminent harm prong of the standing issue.

9                And both of those cases made it clear that a

13:38:30  10    plaintiff cannot rely on claims of past harm when they are

11    seeking declaratory and injunctive relief, in other words,

12    prospective relief only, in establishing that they are

13    subject to an imminent threat of injury.

14                And like I said, both of those were discussed in

13:38:55  15    more detail in our reply brief, and we rely on them again

16    here.

17                In the instant case, the plaintiffs, like the

18    plaintiffs in Lyons and Renne versus Geary, are not in any

19    immediate danger of suffering any imminent injury, simply

13:39:18  20    because all interactions between them and Mahoning County

21    Board of Elections are completed.

22                We don't know what their plans are with regards to

23    petitions in the future.  We don't know what their plans are

24    with regard to making sure that they comply with the even

13:39:37  25    basic threshold requirements for petitions in Ohio.

1          And further, we have the Supreme Court -- Ohio

2    Supreme Court cases that were decided in October that Kevin

3    alluded to, which are Maxcy and Abernathy, I believe.  And

4    those are also cited in our brief.  And what they said was

13:39:59   5    that when a petition proposes a municipal charter amendment

6    as opposed to an initiative to propose legislation, when you

7    are dealing with a municipal charter amendment, board of

8    elections, once it receives direction from the municipality,

9    has really no obligation other than ministerial to put

13:40:29  10    those -- I shouldn't -- I'm sorry, that was the wrong word

11    to use.

12          THE COURT:  But I understand the point you're

13    making.

14          MS. HACKETT:  You understand what I'm saying.

13:40:35  15          And so all of the petitions that these Mahoning

16    County plaintiffs had submitted to the Mahoning County Board

17    of Elections in the past dealt with a municipal charter

18    amendment.

19          And so I suggest that given the now defined state

13:40:52  20    of the law in Ohio, due to those recent Ohio Supreme Court

21    decisions, that area has sort of been cleared up.  And all

22    we have then right now is a -- is a -- excuse me.

23          THE COURT:  That's quite all right.

24          MS. HACKETT:  -- is a state where there are

13:41:08  25    basically no interactions between the Mahoning County

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

1    plaintiffs and the Mahoning County defendants.

2         So I don't know where that live case or

3    controversy comes from or can be even demonstrated by the

4    plaintiffs as against these defendants.

13:41:27  5         THE COURT:  And you know what's been written on

6    behalf of the plaintiffs, and we'll hear in a minute what

7    Mr. Lodge has to say, but one of the cases, I think the

8    primary case relied on, is Babbitt versus United Farm

9    Workers.  And that's a well settled 1979 Supreme Court case.

13:41:45 10        What have you to say about the employment, the way

11   plaintiffs are using it to support its position, that there

12   is an injury, even if it could be considered a prospective

13   one?

14        MS. HACKETT:  Well, I think what distinguishes

13:42:02 15   Babbitt is that in that case, the court found, in essence,

16   the challenge provisions were sure that -- the court made

17   the statement that the challenge provisions were sure to

18   work the injuries alleged.

19        So, in essence, the court did find that the

13:42:21 20   plaintiffs were -- or could be subject to and were likely to

21   be subject to that imminent threat.  They made that specific

22   finding in their decision.

23        So I think that distinguishes the case from the

24   current one before the court, where nothing is imminent

13:42:42 25   here.  We can only speculate as to any future actions of the

1    defendant -- defendants -- I mean, I'm sorry, of the

2    plaintiffs, and we just really don't know what is going to

3    happen going forward.

4         THE COURT:  And if your colleague at the defense

13:42:59  5    table is correct, it will likely show up in the form of a

6    municipal charter amendment, and it will be on the ballot.

7         MS. HACKETT:  That's what I would suggest, Your

8    Honor, yes.

9         THE COURT:  All right.  Well, we'll hear what

13:43:10  10    Mr. Lodge has to say.  And you've reserved, and by my count,

11    the defense still has time if you'd like to make some

12    rebuttal argument on that point.

13         MS. HACKETT:  Okay.

14         THE COURT:  But I'm not cutting you off.  If

13:43:23  15    there's more, I'll certainly hear it.

16         MS. HACKETT:  Okay.  Actually, that was our

17    biggest and most important basis upon which we filed our

18    motion to dismiss.  We did make other points in our motion.

19    But unless we felt -- unless the court has, you know,

13:43:41  20    specific questions for us on them, I would just refer the

21    court to our briefs.

22         THE COURT:  Certainly.  And if I do, I'll ask

23    before we separate, but so far I'm satisfied.

24         MS. HACKETT:  Okay.  Thank you, Your Honor.

13:43:53  25         THE COURT:  Certainly.

29

1          Mr. Lodge.

2          MR. LODGE:  Thank you, Your Honor.  There's a lot

3    of issues here.  I'm not quite sure where to start.  But I

4    would like to acquaint the court with a little bit of the

13:44:12  5    history of Ohio's initiative scheme.  It's about 106 years

6    old, and it was developed and finalized and put to a vote in

7    1912 after a very busy and controversial Constitution

8    convention.

9          The initiative right actually stemmed from a

13:44:42  10   movement that began in the Victorian Era in the 1880s and

11   '90s nationally.  And it gathered steam with what we now

12   historically review and refer to as the Robber Baron

13   Movement.  Post Civil War -- actually beginning especially

14   in the Civil War, corporations began to acquire considerable

13:45:06  15   power and insularity that didn't previously exist.  After

16   the Civil War, Ohio, for instance, the General Assembly

17   granted essentially immunity to incorporators.

18          During this era, incidentally, the state

19   legislature was very involved in granting charters for

13:45:25  20   corporations.  And the original notion was essentially to

21   create a formalized partnership type of arrangement and to

22   identify a group of people who would stand liable if things

23   went wrong.  This would be true if a private concern is

24   operating a turnpike or -- I'm talking a turnpike circa

13:45:51  25   1800s, or some other type of -- a ferrying operation,

1    something like that.

2            After the Civil War, many states, including Ohio,

3    granted immunity to the incorporators, in effect,

4    protection, corporate veil, if you will, which was a

13:46:07  5    remarkable development at the time and considered to be a

6    major lurch forward in history.

7            So the Robber Baron Era occurs in the 1880s and

8    '90s.  The railroads become increasingly powerful.

9    Electricity becomes a valued commodity for the development

13:46:29  10    of trolley, i.e., traction systems and street lighting

11    around the turn of the 18th, 19th century, and that is when

12    investor-owned utilities start making their move as

13    corporations.

14            In Ohio in particular, there is an interesting,

13:46:45  15    long-standing, few decades of controversy over whether or

16    not there would be IOUs, as they are known, versus public

17    traction systems, in Toledo and in Cleveland in particular.

18            The Reform Era, also known and which has come to

19    be known as the Progressive Era, commenced in the 1890s into

13:47:07  20    the 1910s.  It saw, among other things, the beginning of

21    regulatory agencies in order to try to curb some of the

22    excessive greed, corruption and appetites of corporations,

23    which also were heavily influential in state legislative

24    affairs, not just in Ohio, but many states.

13:47:30  25            By the time of the 1912 constitutional convention,

31

there were many movements afoot that drove it to be

convened.  There was a move for women's suffrage.  There was

the Grange Movement, which was possibly the largest

historical national populist leftist type of movement in the

13:47:52  history of the country down to the present, very rural based

and Midwestern based, and had significant influence in Ohio.

There was also the Initiative, Referendum Movement

which stemmed from other efforts.  Labor unions were

beginning to acquire a certain amount of power, such that

13:48:09  they were fighting back against the bosses.  There was

corruption in legislatures.  There was corruption especially

in the granting and non-enforcement of corporate charters.

So by 1912 --

THE COURT:  Sir, let me just say this:  I love

13:48:26  history so you will hold my interest, but I'm not sure that

you'll help your client.

MR. LODGE:  Well --

THE COURT:  So we're only in 1912, and you have

about 56 minutes to go.  Just, you know, use --

13:48:41  MR. LODGE:  I've got a lot of time then, Your

Honor.

THE COURT:  Let me ask this.

MR. LODGE:  Okay.

THE COURT:  And I'll use this as a framework for

13:48:49  listening to -- because I do think I understand the point

32

1   you're making, the deep history of these sorts of

2   initiatives and the results of them having been put on the

3   ballot and eventually being approved.  But I'll let you

4   speak for yourself.

13:49:06   5   Something that drew my attention in your

6   supplemental filing, which I appreciate receiving as well,

7   and I wonder if you meant for me to read it as a concession.

8   I will confess to you that I did.

9   When you distinguished Schmitt and informed the

13:49:23   10   court, it was obvious, but it was certainly fair of you to

11   point it out, that the Schmitt court only addressed the

12   facial challenges, and you explicitly state that you do not

13   believe your clients, that is, that Schmitt can be invoked

14   against plaintiffs' as applied challenges.

13:49:48   15   And I'm interested in what you'll say when you get

16   to that point and whether or not you believe

17   Anderson-Burdick would be the correct analysis for the as

18   applied if you believe that they must be treated separately.

19   MR. LODGE:  Pardon me, Your Honor.

13:50:04   20   THE COURT:  No worries.

21   MR. LODGE:  Actually, you've offered me a good way

22   to turn the corner from the history lesson.

23   THE COURT:  Sure.

24   MR. LODGE:  There was a considerable municipal

13:50:14   25   rights -- what actually at the time was called Municipal

33

1  Socialism Movement that had considerable sway at the

2  constitutional convention.  The same convention produced the

3  home rule amendments to the Ohio Constitution.  It's a lot

4  of -- and very intriguing byplay, which I will not take the

13:50:35  5  court's time up with.

6        But the Article I, Section 2, as well as the

7  explicit initiative and referendum rights, had considerable

8  steam and momentum coming out of the 1912 convention and

9  were enacted as amendments to the Constitution.

13:50:57  10        The point -- one major point is this:  That every

11  time the issue of whether or not an election official,

12  whether it be the secretary of state or board of elections,

13  may inquire into the substance of a proposal, a local

14  initiative proposal, 25 times, the Ohio Supreme Court, at

13:51:21  15  least 25 times, in dating back to 1918, down to 2019, has

16  affirmed the precept that it's hands off, and with the

17  reasons that you have to keep hands off as an election

18  official are several.

19        One is, we're talking about determinations of

13:51:41  20  illegality or constitutionality, which before something is

21  enacted is mere speculation.

22        Secondly, that guess as to constitutionality or

23  legality if passed is a loaded question and is not facially

24  neutrally applied, because it depends on who's making the

13:52:06  25  determination.

34

1          There is a separation of powers issue, because

2     BOEs and the secretary of state are, of course, in the

3     Executive Branch.

4          And the courts exist to determine after something

13:52:22  5     is ripe because it has been enacted into law to determine

6     whether it should be allowed to stand or whether there are

7     parts of it that can be severed to allow whatever is left to

8     stand.

9          So the philosophy, the policy articulated by the

13:52:40  10    state Supreme Court repeatedly, for a hundred years, is

11    hands off.  The courts exist to do this when there is

12    leisure, not in the heat of a mandamus or prohibition kind

13    of action during the election season.

14          THE COURT:  Let me ask if you can help me to

13:53:01  15    understand why it is, then -- and this is again referring

16    back to Schmitt and Judge Bush's concurrence.  When he

17    describes the gatekeeper rules that we're talking about, he

18    refers to them as election mechanics.

19          Why isn't it sufficient, when there isn't that

13:53:21  20    human error that he also writes about that can lead to some

21    sort of discriminatory application, barring of something,

22    why isn't it sufficient that the mechanics, that as you

23    heard Ms. Staff say are designed to keep the ballots from

24    being uncluttered, to avoid the loss of confidence, and

13:53:40  25    always having to go back later, why isn't this gatekeeper

35

1    function correctly applied as it is now as long as there is

2    the opportunity to do precisely what your clients are doing

3    now, to bring the matter -- first of all, you can mandamus

4    the court.  There is that provision.  But then also to

13:54:01   5    litigate further if you think necessary.

6              MR. LODGE:  All right.  And I will come back to

7    Schmitt.

8              I'd like to point out that election mechanics have

9    been subjected to mission creep especially in the last 10 to

13:54:16  10    20 years.

11              THE COURT:  You mean erosion?

12              MR. LODGE:  Yes.

13              THE COURT:  Okay.

14              MR. LODGE:  Because election mechanics is fine if

13:54:22  15    it is some wording on the petition.  The initiative petition

16    has to be in red.  You have to have the warnings about

17    felonies.  If you -- you know, if you're a circulator and

18    you defraud the public or the state in your petitioning

19    activity, that sort of thing.

13:54:40  20              Whether the paper size is correct.  Whether

21    there's a -- whether there's a committee of sponsors

22    enumerated by name and address.  All of those are the real

23    mechanics.  They are ministerial responsibilities that

24    historically have fallen correctly to election officials.

13:54:58  25    Of course you want that.

1          The mission creep, the erosion, is that at first

2     through secretary of state folkways most recently epitomized

3     by some of the determinations made by former Secretary of

4     State Husted, that what has happened is his initial

13:55:20    5     interpretations of what scope of review, whether or not a

6     petition qualifies as something that can be enacted, has

7     been a very long-running attempt to create 88 constitutional

8     preelection courts out of boards of election, which are in

9     no position to be that, no position to serve in that role.

13:55:48   10          Again, why do we have to engraft a new preelection

11     veto censorship type of system onto a system that has worked

12     well with court retrospective review for a century?

13          The impetus out of the constitutional convention

14     was that, by golly, there is going to be local rights, and

13:56:10   15     yes, cities and local governments are going to have the

16     right to legislate.

17          And the principle has been repeated in some of

18     those two dozen decisions by the Ohio Supreme Court that

19     even if illegal, and this was a Mahoning County case in

13:56:30   20     2015, even if the proposal is enacted and is illegal upon

21     enactment, it cannot be vetoed from the ballot by a board of

22     elections or a secretary of state, even if illegal.

23          THE COURT:  So am I to understand you to say that

24     any ballot initiative that a voter, with the correct number

13:56:56   25     of signatures, presents must go on, and your position,

37

1      should go on the ballot --

2              MR. LODGE:  Yes.

3              THE COURT:  -- and to be dealt with later?

4              MR. LODGE:  Yes.  And it's because in the Ohio

13:57:10  5   Constitution now is enshrined to the concept that the people

6      are also legislators when they do this.

7              Let's think about the Ohio General Assembly and

8      what the Ohio General Assembly does.  The Ohio General

9      Assembly repeatedly passes abortion statutes or statutory

13:57:33  10  regulations that its sponsors admit probably will not stand

11     muster against Roe v. Wade, but they do it anyway.

12             And they do it to send a message.  There are

13     political reasons.  I'm not going to go deeply into that,

14     other than to point out that nobody, certainly not a court,

13:57:52  15  certainly not the governor, certainly not the public, is

16     allowed to say, "No, you can't consider passage of that law.

17     You can't even talk about it.  You can't vote on it.  It

18     would be illegal if passed."

19             The people deserve and have, under the Ohio

13:58:07  20  Constitution -- Constitution framework, that right right

21     now.

22             But let's talk about House Bill 463.  The Ohio

23     Legislative -- if I can find it.  Give me a moment, please.

24     I may have -- ah, all right.

13:58:25  25            The Ohio Legislative Service Commission, which as

38

1    the court I'm sure understands, is the drafting entity for

2    the General Assembly, always -- well, often is asked to

3    produce an analysis of a major complicated bill.

4         House Bill 463 is the December 2016 lame duck

13:58:48  5    session grab bag, Christmas tree they call it, Christmas

6    tree legislation.  It started out as a foreclosure

7    clarification bill and turns into quite a dicey thing that

8    addresses two or three dozen different topics, including

9    gutting initiative rights under Ohio law.

13:59:09  10        The Ohio Legislative Service Commission, in an

11    analysis that's available online, expressly warned that "The

12    bill's," quote, "The bill's provision concerning local

13    initiative petitions might be vulnerable to a challenge

14    under the Ohio Constitution on two grounds:  1) that the

13:59:28  15    bill infringes on the people's right of initiative; and 2)

16    that the bill violates the separation of powers doctrine."

17        So, and it goes on.  There's a considerable

18    analysis here, analysis presented.  "A reviewing court,"

19    also I'm quoting, "might rule that the bill violates a

13:59:48  20    separation of powers doctrine of the Ohio Constitution by

21    giving the secretary of state or board of elections the

22    authority to decide the constitutionality of a proposed

23    statute."

24        There are -- there's other analysis.

14:00:02  25        But the point is, before they voted on it, before

39

1    it came out of whatever committees, if it even passed

2    through committee, it was a lame duck bill, before that

3    happened, the General Assembly was told, "You're going to

4    waste a lot of time and money of other people, of citizens

14:00:20  5    who want initiatives on the ballot by passing this."  And

6    they did it anyway, because they could.  Because --

7         THE COURT:  So how much longer do you think that

8    kind of mission creep or activity could happen before the

9    general voter just loses interest and stops showing up?  And

14:00:39  10   so that there are these myriad laws that result as a result

11   of appropriate number of signatures and matters on the

12   ballot and the few folks who still care showing up?

13        I mean, isn't that also a risk?  Isn't that an

14   interest that the state legitimately has?  I use the state

14:01:00  15   generally as the defense.

16        MR. LODGE:  The state does not have an interest in

17   encroaching on First Amendment association rights of people.

18   The initiative process involves several different types of

19   First Amendment protected activity.  Petitioning, of course.

14:01:20  20        A petition, even if it doesn't go onto the ballot

21   or they don't get enough signatures, a petition encourages

22   public dialogue and debate.  Once it's put on the ballot, a

23   campaign can ensue that -- at a higher level, a more visible

24   way, that a topic or an issue is discussed within a

14:01:41  25   community.

40

1          And then there's, of course, the constitutional

2     act of voting, which is, in its own way, an exercise of

3     associational types of free speech.

4          So there are considerable rights implicated by the

14:01:59  5     First Amendment in protecting the initiative in Ohio.

6          THE COURT:  Well, the associational rights are not

7     diminished.  If anything, the better argument, as I see it,

8     might be that it's delayed, because there isn't the placing

9     of the matter on the ballot to start with for it to be voted

14:02:17  10     upon, but rather, conversation or litigation results.

11          So it's not as if it could never be put on the

12     ballot, it's just a matter of not being put on the ballot

13     without some non-content-based evaluation.

14          MR. LODGE:  The problem is is that the

14:02:38  15     content-based evaluation has already produced quirk-ish

16     results.  In the -- boy, I'm trying to remember.  I believe

17     it was in 2017, the Youngstown citizens attempted to put a

18     bill of rights on the ballot.  It was vetoed by the board of

19     elections.

14:02:58  20          While it was being litigated in mandamus at the

21     Supreme Court -- that's the Flak v. Betras decision.  While

22     it's being litigated, a very similar rights -- community

23     rights proposal, charter amendment, was proposed in the City

24     of Bowling Green.  The Board of Elections in Wood County,

14:03:17  25     four to nothing, put it on the ballot.

41

1          So you have the too many constitutional

2     quasi-courts delivering completely opposite interpretations

3     of the same law.  The Wood County Board of Elections people,

4     one or two of them actually said in comments that they

14:03:37  5     didn't believe that it was -- that House Bill 463 was

6     lawful, that those provisions could be enforced.

7          And so you have the possibility of anomalous

8     results that work differently in different communities

9     according to the politics of the community.  And that ain't

14:03:58  10     justice.  That is not -- that is not the free speech that is

11     contemplated by having the initiative power laid in the

12     citizenry.

13          To answer your question, work back to Schmitt,

14     Your Honor, it is our position -- the Schmitt case is

14:04:16  15     actually quite narrow.  The decision there says that the --

16     the trial court decision, pardon me, was that the statute

17     that says that there is no appeal, the decision of the

18     secretary of state shall be final, was determined to be

19     unconstitutional, and then, of course, reversed.

14:04:39  20          But we believe that the as applied principle is

21     quite alive and well and keeps our claims before the court,

22     because of the fact that the lawsuit that we have written

23     and produced for you is an enumeration of the ad hoc, as I

24     said, mission creep types of excuses that are rendered time

14:05:07  25     and again to keep initiatives off the ballot.

42

1          There's careful wording that says, "The board of

2     elections or the secretary of state shall review the

3     proposal to make sure it's within the scope of what a local

4     government can legislate," and that's code for decide

14:05:28  5     whether or not it's legal in your opinion, guys.

6          And there is concerted activity between the

7     secretary of state and the boards of election, the members

8     of which are appointed by and serve at the whim of the

9     secretary of state.

14:05:46  10          So each of the 88 boards of election, while there

11     is certainly some autonomy in how they vote, you can be

12     assured that in these controversies, they are coached and

13     certainly guided by the secretary of state's office.

14          So we're talking about the Executive Branch

14:06:06  15     irrigating power to itself that is reserved for the courts

16     to sort out after the people have stood in the role of local

17     legislator.

18          I'd also like to point out that Schmitt, the Sixth

19     Circuit Schmitt, simply reverses things.  It applies a

14:06:30  20     medium grade standard of review.  But we're talking about --

21     and the Schmitt decision did not at all address the hundred

22     year history, the two dozen or so Supreme Court cases that

23     say content review is completely off limits.

24          Our lawsuit seeks for this court to make the

14:06:52  25     determination that a rule, not one that is laden with

43

1    asterisks or footnotes, lame excuses and ad hoc

2    decision-making, that there's one rule that says you don't,

3    as election officials, you are not allowed to look at the

4    substance of a -- of a proposal.

5         One of the justices, Justice Fischer on the Ohio

6    Supreme Court, refers to this as a -- in a somewhat humorful

7    way, as a substantive procedural issue, where the BOEs or

8    the SoS are allowed to make a substantive determination

9    under the guise of merely following a supposed process.

10   That's mission creep.  Because they're allowed to analyze

11   the substance and decide if it would be in the scope of a

12   local legislature or local city council's power -- or a

13   local county council's power to pass.

14        So the problem is, is that as long as the Ohio

15   Supreme Court, which has reduced itself to paying lip

16   service to this time-honored principle, but then saying --

17   but finding excuses that keep things off the ballot.

18        As long as that is allowed to continue, it will --

19   it will produce the results of turning people off, of making

20   people feel at the local level that they do not have power.

21        The constitutional convention in 1912 was in

22   circumstances that are -- that at least reverberate down to

23   2019, where we have corporate control and commodification of

24   many, many things in our society, privatization of

25   governmental functions for mere profit, where we have an

44

1    Ohio General Assembly that some would say is the best

2    legislature money can buy, as certainly exemplified in the

3    recent battle over utility bailouts.  So we have a situation

4    here --

14:09:03   5           THE COURT:  Let me ask you a question that --

6           MR. LODGE:  Yes.

7           THE COURT:  -- regards the way in which I've been

8    thinking about these, and might, dependent upon your answer,

9    continue to think about these.  It stems from something you

14:09:17   10   wrote but said also.

11          Schmitt was narrow in the way you describe.  I

12   think none of us will agree, because it found -- pardon me,

13   Sixth Circuit Schmitt, it found the as applied challenges to

14   the First Amendment moot.

14:09:35   15          MR. LODGE:  Moot, right.

16          THE COURT:  Are you conceding, then, that the

17   facial challenges, that being Counts 1, 3 and 5, are binding

18   on your clients' position?

19          MR. LODGE:  I'm not certain I understand the way

14:09:50   20   you've worded the question.

21          We believe -- we don't subscribe -- given the

22   narrowness of the facial challenge that the Sixth Circuit

23   addressed, we don't believe Schmitt has any serious effect

24   of moment on this lawsuit.

14:10:12   25          THE COURT:  Rather, the challenge is as applied or

45

1    moot or facial?

2         MR. LODGE:  Correct.  Correct.  And we also -- I

3    also disagree --

4         THE COURT:  And tell me why it is you believe

14:10:22  5    that.

6         MR. LODGE:  Well, the facial -- the statutes

7    themselves certainly suggest that there's a problem --

8         THE COURT:  Uh-huh.

9         MR. LODGE:  -- because of the fact that, as I say,

14:10:33  10    there's an invitation to election officials to sort of make

11    whatever they wish of scope of review types of wording.

12         What we have delineated in the complaint are

13    multiple examples of where substance is called procedure,

14    substance is called simply a review, particularly in the

14:10:57  15    county charter proposal arena.

16         And that's okay, because the statute says that we

17    have to do that now, without going a little bit beneath the

18    surface and realizing that as that statute is applied, it

19    contains few to no standards.  The standard is whatever,

14:11:20  20    frankly, a county prosecutor thinks might be illegal if

21    passed.

22         Incidentally, I'm offended by the word "cluttering

23    the ballot."  The ballot needs to be a lot more cluttered.

24    People need to have a lot more opportunities to exercise a

14:11:36  25    direct vote and say.

46

1          THE COURT:  Let me just go back to my question,

2     because my chief ambition here today is to make sure that I

3     understand you and your position.  And I think I put this

4     question to Ms. Staff, and I am going to try to ask it in a

14:11:54  5     similar way.

6          Because what I wanted to understand is if she

7     believed my analysis of the as applied challenges would be

8     dispositive of the facial challenges, because Schmitt didn't

9     address the as applied challenges.

14:12:13  10          So I think it's without doubt that my job here,

11     without that guidance, certainly includes an analysis of the

12     as applied challenge.  So the question -- challenges.

13          The question I have for you is the analysis of the

14     as applied challenges --

14:12:33  15          MR. LODGE:  Yes.

16          THE COURT:  -- are they -- is it dispositive of

17     the facial challenges as well?

18          MR. LODGE:  No.  And I will tell you this.  After

19     reviewing the complaint, which I was involved in the

14:12:45  20     drafting of just about ten months, nine months ago, I guess,

21     in retrospect, I think that the wording of the statutes that

22     are under challenge is evidentiary and that essentially this

23     is a case that involves as applied claims.

24          And I therefore don't believe that the facial --

14:13:15  25     that it is appropriate to deem the facial challenge stuff to

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

47

1    be conceded.  But I would possibly have restructured the

2    complaint so that all of the claims were reflected as

3    applied and cited the gateway problem, if you will, with the

4    statutes.

14:13:39    5    THE COURT:  And I'm sure you probably don't intend

6    for me to mean that you are dismissing the facial

7    challenges.

8    MR. LODGE:  No, no, not at all.

9    THE COURT:  No misunderstanding.

14:13:48    10    MR. LODGE:  I'm recognizing the court's inherent

11    power to construe the pleadings to do substantial justice.

12    THE COURT:  Just making sure you're on your toes.

13    You're probably working your way up to this, but I

14    am interested, it wasn't just bookkeeping when I asked about

14:14:05    15    Counts 6 and 7, which I also think about in a similar way,

16    and then also 8.  And I know you'll get to them, but just a

17    reminder to please do.

18    MR. LODGE:  Well, let's talk about them now.

19    The court is certainly -- I think the court is,

14:14:25    20    from a technical standpoint, allowed under the doctrine of

21    supplemental jurisdiction to decide whether there's a

22    violation of separation of powers under Ohio law.

23    The court certainly is familiar with the very

24    analogous federal separation powers types of claims.  And we

14:14:46    25    believe that there's nothing especially subtle about what

48

1     has happened with House Bill 463 amendments to the statutes

2     that are under challenge.

3          Number -- oh, boy, pardon me.

4          THE COURT:  What I thought you might have been

5     about to address is the local community self-governance

6     that's Count 6.  What, if you have any law that supports the

7     belief that -- or can tell me whether a court has recognized

8     local community or self-governance as a fundamental right

9     under the United States Constitution or the Ohio.

10          MR. LODGE:  We'll stand on our written arguments

11     as far as that's concerned.  I am not aware of any precedent

12     since the time of authoring the memo.

13          THE COURT:  And before the memo was authored,

14     certainly Justice Sotomayor's concurring decision in John

15     Doe versus Reed.  And it's simply the one wherein she says,

16     "Instead it is up to the people of each state to decide

17     whether and how to permit legislation through mechanisms of

18     direct democracy, such as the initiative power and

19     referendum power."

20          Meaning -- and that was against the notion that

21     the right to local community self-government is governed by

22     state law.  And she writes, "It's not a fundamental right

23     under the United States Constitution."

24          Does that ring a bell?

25          MR. LODGE:  Yes.  Thank you.  I'd also point out,

MARY L. UPHOLD, RDR, CRR          (330) 884-7424

49

1    Your Honor, that Article I, Section 2 of the Ohio

2    Constitution, which is sort of the inherent -- reserves to

3    the people the inherent power to change a government which

4    no longer serves their interest, is something that in one

14:16:48  5    form or another is found in all 50 state Constitutions, and

6    it has fallen into disuse.

7         And the Ohio Supreme Court, when asked to make

8    pronouncements about it in some of the cases I've been

9    associated with, continues to basically make rulings on

14:17:09  10    sub-Constitutional grounds or whatever.  It never gets to

11    the issue.

12         The problem is, is that it either means something

13    or it doesn't.  And if it doesn't, I am not sure what that

14    says about our democracy.

14:17:23  15         THE COURT:  One of the things I appreciated about

16    the complaint, and I'll certainly defer to you about how it

17    could be improved, but I appreciated the many instances of

18    attempts to, successful or otherwise, eventually to place

19    matters on the ballot.

14:17:42  20         But what I don't believe is revealed there, nor in

21    the papers filed since, is an episode, that rare episode

22    that would shock the conscience.  And that's something else

23    that I've been looking for in the evaluation of Count 6

24    primarily, but also Count 7.

14:18:08  25         MR. LODGE:  I think that I would ask the court to

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

50

1    review closely the circumstances enumerated in the complaint

2    as to what I continue to call the erosion.  I think that

3    House Bill 463 hidden, never assigned to a committee, hidden

4    in a lame duck session bill that covered about 31 or 32

14:18:31  5    other unrelated topics, which possibly runs afoul for all of

6    that, of Ohio's single subject rule, I think that it shocks

7    the conscience because it attempts to codify a statutory

8    enactment that overrules pertinent constitutional

9    interpretations going back for a hundred years.  I think

14:18:52  10    that that shocks the conscience incredibly.

11         I think that what -- what we are watching -- maybe

12    I should explain a couple of other things, in fact.

13         In 2015, the State of Ohio voters I believe were

14    misled into changing the Constitution so that a statewide

14:19:16  15    initiative hereafter, all statewide initiatives have to go

16    through a board of five people chaired by the secretary of

17    state for analysis of whether they are -- in the proposal,

18    the initiative that's being proposed, creates a monopoly

19    practice.

14:19:34  20         This was an issue that was passed -- that was,

21    pardon me, on the ballot at the same time as an issue to

22    legalize marijuana sales, but confining the production to

23    ten selected vending corporations.

24         There was some outrage about that from a market

14:19:55  25    perspective.  And the legislature quickly added to the

1    ballot a proposal that creates no longer a court system, but

2    a board of five people who may only be challenged indirectly

3    via mandamus as to whether they require a two-step vote to

4    take place.

5            There's actually wording now -- it passed, the

6    measure passed, and there's wording required to be shown,

7    basically as I understand the mechanics, the voter is first,

8    on the voting machine, shown the screen that basically says,

9    "Shall such-and-such a proposal dislodge the current lawful

10   activity of such-and-such," and if the answer is yes, then

11   you go to a second screen to vote yes or no on the actual

12   proposal.  So that was 2015.

13           More recently, in 2019, in the budget bill, the

14   other Christmas tree enactment of the Ohio General Assembly,

15   which starts out as about an 800-page budget of all state

16   governmental activity, and always balloons into something in

17   excess of 2- to sometimes nearly 3,000 pages, and it's a

18   grab bag of all kinds of unrelated things, there is a -- the

19   pending court challenge that Lucas County counsel referred

20   to pending in federal court in Toledo over the rights of

21   nature, the Lake Erie Bill of Rights, rights of nature

22   provision.

23           The General Assembly sneaked through, without

24   committee reference, without any publicity of any great

25   moment, sneaked through a provision that makes it unlawful

1    to raise -- for anyone to basically raise in court the issue

2    of stewardship of a natural resource.

3         So what you see is not just an attempt to irrigate

4    court-like quasi-judicial power to an Executive Branch

14:21:59  5    agency, but there is a continuing legislative undercutting

6    of what are appropriate topics to be raised via initiative;

7    and indeed, at the state level so far, whether an initiative

8    can even be voted on.

9         I'd like to point out also, Your Honor, that the

14:22:19  10    Saferin decision, which is the one that somewhat momentously

11    changed how local charter initiative amendments get to the

12    ballot, didn't address several other important things.

13         It addresses, of course, the matter of requiring a

14    supermajority of a city council to put something on the

14:22:41  15    ballot, and it reduces the board of elections' role to what

16    is called ministerial.

17         But it didn't address ordinances that are

18    initiated at the local level.  It did not address charter --

19    county charter proposals that are a hybrid constitutional

14:22:59  20    and statutory creature.  And it also did not address what

21    happens when a local member of a city council says, "You

22    know, that thing would -- that would be illegal if it was

23    enacted, so I'm not going to vote to put it on the ballot."

24         In other words, what happens when city councils

14:23:23  25    who are supposedly acting legislatively, although I would

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

53

1    contend it's a mere administrative matter to vote something

2    onto the ballot if the number of petition signatures has

3    been produced, those issues still remain open.

4            And that gets me into the matter of the continued

14:23:43  5    standing of the Mahoning County plaintiffs who have tried

6    eight different times, going back at least as many years,

7    possibly a few more, and have in their most recent attempt

8    to pass a community bill of rights, yes, the Saferin

9    decision came out -- or pardon me, the Flak decision came

14:24:11  10   out and the citizens removed a local enforcement clause from

11   their proposal, and the board of elections says, "Okay, it

12   can go onto the ballot."

13           These battles, especially in the Mahoning group,

14   but certainly by no means not just the Mahoning group, these

14:24:29  15   battles are at a terrible price, a terrible price in

16   attorney fees, but more importantly, a terrible price in the

17   loss of access to public debate to campaign.

18           The legislation wins its way through the Supreme

19   Court mandamus process, and in a couple of instances, the

14:24:50  20   Supreme Court has ruled Pyrrhicly for the citizens, for

21   instance in the Bowling Green case, allowing something onto

22   the ballot.  But there was a -- as I recall, something on

23   the order of fewer than 16 days to campaign.  So things were

24   in limbo.

14:25:09  25           The Supreme Court rules, yay, the citizens win,

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

54

1    and they have few resources anyway and little access to

2    garnering public debate and didn't have any throughout the

3    election season until two and a half weeks before the

4    election itself.

14:25:27    5         So the problem is, the measure -- the principle

6    measures that have been pushed by the Mahoning citizenry

7    still have not been enacted into law.  It is highly likely

8    that there will be additional future campaigns, and that

9    these unresolved matters, and who knows what other kinds of

14:25:48   10   excuses will be raised by election officials to deter things

11   and divert them from going onto the ballot.

12        So we believe that the complaint actually is

13   perhaps, if I may say so, more like a RICO allegation than

14   simply a damages complaint.  The plaintiffs seek no monetary

14:26:09   15   damages.  They are looking for prospective injunctive

16   relief.

17        And the evidence is -- emanates from election

18   travails in seven different counties that have citizens who

19   are bona fide plaintiffs who have circulated petitions or

14:26:28   20   been in the steering committees of the citizen sponsoring

21   groups.  So --

22        THE COURT:  But even if -- if you don't mind me

23   interjecting now, because I sensed you may have been

24   wrapping up the standing argument to move on, and before you

14:26:41   25   do, I'd like to hear from you on this.

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

55

1           I noted that you used "it's highly likely" that

2     your clients would seek something more from Mahoning County

3     that isn't before the county now, is how I interpreted that

4     statement.

14:26:57  5           But that's just not what the law requires.  The

6     law requires present adverse consideration, not just

7     speculation prospectively of what might happen once that

8     matter does mature and is presented to Mahoning County.

9           That's what I see.  And you might recall that I

14:27:19 10   shared that concern before today.

11           MR. LODGE:  Correct.

12           THE COURT:  So I'm keenly interested in how --

13     what legal distinction you can make.  "Highly likely" just

14     isn't a term of art associated with standing, at least not

14:27:34 15   in a successful way.

16           MR. LODGE:  No, but I think a term that is

17     associated with it is where -- boy, and I'm at a little bit

18     of a loss to remember the precise wording, but it is where

19     something recurs but escapes review, repetition occurs, but

14:27:53 20   each time -- and this is very common in First Amendment

21     types of cases anyway, that the citizens, for instance, have

22     attempted repeatedly to put something on the ballot, and

23     they are unable to get a merits direct appeal type of review

24     because of a variety of factors, not the least of which is

14:28:15 25   that they usually have to litigate in a mandamus action in a

56

1   very charged, lightning round of briefing type of mandamus

2   action before the Ohio Supreme Court.

3       So I think that the court may legitimately

4   consider the history of the citizens' activity in Mahoning

14:28:37   5   County, in Youngstown, and conclude from it that the very

6   plaintiffs -- the plaintiffs are some of the very people who

7   have been at the core from the beginning, at eight different

8   tries at getting something on the ballot and/or having a

9   vote taken on it, which has happened a few times.

14:28:57   10       I believe that the court may consider highly

11   likely to be serious evidence of intention, and evidence, as

12   I say, of a history of misdeeds by election officials that

13   contrive circumstances to keep public votes from taking

14   place.

14:29:19   15       THE COURT:  You heard Mr. Pituch speak about the

16   one change in the law that he sees may be advantageous to

17   your clients, and that's the Supreme Court's ruling that

18   municipal charter amendments shall be placed on the ballot.

19   So that's certainly an improved circumstance, one that

14:29:41   20   perhaps wasn't in existence.

21       And I know we're talking about Mahoning County

22   versus, say, the City of Youngstown.  But there could be

23   some culling and maybe something done just on behalf of

24   Youngstown.

14:29:55   25       So it seems that if there was some chilling

57

1    effect, that measure warms it up a bit.  Do you see it

2    differently?

3           MR. LODGE:  Well, as I suggested earlier, the

4    Maxcy case says with a supermajority, a local council is

14:30:16  5    required, apparently, to put a measure on the -- a

6    Constitution -- pardon me, start over -- a municipal charter

7    amendment on the ballot.

8           THE COURT:  Well, I understand you.

9           MR. LODGE:  And the question has not yet been

14:30:29  10   answered and is probably out there someplace, what happens

11   when a majority -- the supermajority vote is not attainable

12   because one or more of the members of the city council say,

13   "You know, I'm not a lawyer, but that isn't going to be

14   legal if it's passed, so I'm not going to inconvenience and

14:30:47  15   burden the public with the expense of an election."

16          Then what happens?  Then you have, again, a

17   circumstance where city council, acting as effectively as an

18   election official, has intervened to keep something off the

19   ballot because of considerations of content.

14:31:04  20          So I -- Maxcy did not cure everything.  It makes

21   it more possible, yes.  But again, it depends, for now, on

22   the good faith, the bona fides of the members of council who

23   were asked to vote in what I still think is a merely

24   administrative ministerial type of role to put something on

14:31:30  25   the ballot.

58

1          THE COURT:  You wrote about Babbitt.  You heard

2     the question I framed about it.  And the one concern I still

3     have and would like to hear from you is whether you can

4     offer something to encourage me to believe that your clients

14:31:48  5     would be subject to some imminent threat of harm.

6          I mean, there is this notion of, well, there is

7     the exertion in the past, the repetitive exertion, the

8     weariness, the costs of the exertion.  But, again, sort of

9     lunging towards, but I'm not even at the present adverse,

14:32:07  10    but I'm talking about some imminent threat of some harm

11    resulting.

12          MR. LODGE:  The harm to the state constitutional

13    right to initiative is a -- is imminently being attacked, as

14    I've illustrated.  It's being attacked --

14:32:24  15          THE COURT:  Well, and I -- let's say for the

16    moment --

17          MR. LODGE:  Okay.

18          THE COURT:  -- without -- that -- even if that's

19    the case, what we're really talking about, though, is the

14:32:36  20    ask for declaratory judgment and injunctive relief.

21          MR. LODGE:  Okay.

22          THE COURT:  And I'm not even sure, quite frankly,

23    Mr. Lodge, how I'd write that order.  "Mahoning County,

24    going forward, you can't..."  I mean, it's even that basic

14:32:56  25    when I just try to look at it in a very elementary level.

1          Do you see the point I make?

2          MR. LODGE:  No, and I'm sorry.

3          THE COURT:  Well, I don't see the harm or what I

4    could instruct.  It's one thing to tell the county, "You

14:33:09  5    shall not do this, and going forward it would be illegal as

6    well."  I'm not sure what it is you would tell me to tell

7    the county based on what's before me as the harm, the case,

8    the controversy regarding Mahoning County.

9          MR. LODGE:  The order would probably --

14:33:29 10          THE COURT:  And if I hear another word, I will

11    clear the room.  You've been wonderful.  I'm pleased that

12    your civic interest has brought you here.  But you've chosen

13    well.  He's doing all right without the murmuring.  And I

14    think that was more in support of you than me, so...

14:33:44 15          No, please, you go ahead.  You still have 11 whole

16    minutes.

17          MR. LODGE:  Thank you.

18          The harm is -- boy --

19          THE COURT:  But let me ask you, and think of it in

14:34:05 20    the way that I've suggested.  It's elementary, but I think

21    at times we have to get down to nuts and bolts.

22          The order as to Mahoning County, if you were to

23    draft it, would look like what?

24          MR. LODGE:  It would look like, "Henceforth, the

14:34:24 25    board of elections is constrained to review initiative

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

60

1  petitions," and you would have to break it out by category,

2  if it was a county charter, city charter amendments, city

3  ordinances.

4  But it would state -- it would refer to some

14:34:40  5  statutory basis for the very ministerial -- the true

6  gatekeeper kinds of functions that the board of elections is

7  confined to.

8  And that it would essentially have to say that

9  inquiry into -- you would have to find that there is a

14:35:06  10  conflation of the terms, scope of review -- or scope of

11  authority, pardon me, and that the court would have to find

12  and declare that that is effectively coded language for an

13  invitation for local election officials to actually make a

14  judgment call as to whether something would be lawful or

14:35:29  15  constitutional or not if passed.  That effectively, the

16  measure cannot be assessed, reviewed, analyzed for anything

17  but strict form types of requirements.

18  And I understand that there are occasionally

19  things that look like substantive but are actually

14:35:53  20  procedural ministerial reviews.  And let me give an example.

21  If a library district or a school district wants

22  to -- wants a new or increased levy, the proposal as it

23  appears on the ballot is actually supposed to state numbers,

24  you know, what the amount of the millage is and all that, to

14:36:15  25  generate a certain dollar, minimum dollar amount of revenue.

61

14:36:36

14:36:54

14:37:15

14:37:39

14:37:57

```
1          And I have seen a couple of cases where boards of

2    elections caught a dumb mathematical mistake, and basically

3    deterred something from being put on the ballot because it

4    was erroneous and they sent it back to the local government

5    saying, "You've got to fix this."

6          That is a form type of matter.  It's not a

7    substance matter, not really.

8          So there are some points that at first glance

9    might appear to give considerably more substantive power to

10   a board of elections than actually occurs.

11         They're supposed -- the board exists to decide if

12   there's enough voters and they're registered and the form's

13   right and the circulator is signed correctly and all of

14   that, as well as very minimal scrutiny of the content.

15         The conflation has happened, actually, where the

16   statute says, "The petition shall be scrutinized by the

17   board of elections."  That's actually pretty particularized

18   statutory wording.  The petition contains an initiative

19   proposal.  You're supposed to look at the four corners of

20   the document for its propriety under state law, not the

21   proposal contained within the document.

22         THE COURT:  In your example, when the math is off,

23   would the board, under your rubric, be able to correct the

24   math or send it back?

25         MR. LODGE:  Send it back probably would --
```

MARY L. UPHOLD, RDR, CRR        (330) 884-7424

62

1          THE COURT:  So there would be some interpretation?

2     There would be times when even under your system, review

3     would be -- review and modification would be appropriate?

4          MR. LODGE:  Sure.  I expect the -- certainly

5     there's nothing to keep a board of elections from reading

6     the initiative.  But the question is whether or not they are

7     allowed to make a determination in the manner of censorship.

8     And in a math screw-up such as I cite, they're not censoring

9     the speech, they're saying -- there's legal requirements

10    that the proposal has to say the following to the voters,

11    and there are -- I believe in the tax code, there are -- or

12    possibly in the education code, in the library code, but in

13    any event, there are explicit requirements as to how revenue

14    measures are to be put to the public.  And they're simply

15    administering a statute.

16          We keep getting, incidentally, without talking

17    about it, back to the administration versus legislation kind

18    of thing, and that has become one of the excuses, where

19    boards of election are basically saying a measure is

20    legislating even though -- or they're saying it's

21    administrative and not new legislation.  That's another one

22    of the ways that initiatives have been, in my reckoning, at

23    least, sometimes gamed.

24          But I think that the court could draft a very

25    meaningful type of injunctive order.

63

1          THE COURT:  Thank you, sir, for indulging me on

2     that topic.

3          You are whittling away your time, and you still

4     have some, not much.

14:39:50   5          MR. LODGE:  Unless the court has any other

6     questions, I'm --

7          THE COURT:  Willing to save what you have left?

8          MR. LODGE:  I'm willing to, yeah.

9          THE COURT:  All right, then.  I don't at this

14:39:57  10    time, but I appreciate the attention you've given me.

11          MR. LODGE:  Thank you.

12          THE COURT:  And I'll circle back to the defense

13    table and give you an opportunity to speak again.

14          Ms. Staff.

14:40:10  15          MS. STAFF:  Your Honor, if I may, I have a few

16    brief remarks.  As Your Honor is well aware, federal courts

17    are courts of limited jurisdiction.  Unlike state trial

18    courts, federal courts do not have general jurisdiction to

19    review questions of federal and state law, but only the

14:40:31  20    authority to decide laws and questions that are before them

21    under statutory and constitutional limits.

22          This case simply no longer presents a federal

23    question for this court to consider.  Schmitt has resolved

24    any federal claims these plaintiffs had.

14:40:49  25          And I did want to briefly address their as applied

64

1    issue just once again briefly.  This case presents a stark

2    contrast to the Schmitt facts, where the Schmitt plaintiffs

3    had particular as applied claims in their complaint.  They

4    were seeking ballot placement for the November 2018 general

14:41:10  5    election.

6            Here there are no specific as applied claims with

7    respect to any of these plaintiffs.  They seek the same

8    relief, general declarations, general injunctive relief

9    under their both as applied and facial challenges, and both

14:41:27  10    fall for the same reason, because these laws are

11    constitutional.

12            With no federal claims left, the only court that

13    has the final say over the meaning of the constitutionality

14    of these laws is the Ohio Supreme Court.  And the Ohio

14:41:44  15    Secretary of State's position is that this complaint should

16    be dismissed in total under Rule 12(b)(1) and 12(b)(6).

17            Unless the court has any further questions, I

18    would be happy to entertain those.  Otherwise, I will cede

19    the remainder of my time to the other defendants here.

14:42:00  20            THE COURT:  Thank you, Ms. Staff.  No questions

21    for you.

22            MS. STAFF:  Thank you, Your Honor.

23            MR. PITUCH:  Good afternoon again, Judge.

24            THE COURT:  Certainly.  Same to you, sir.

14:42:14  25            MR. PITUCH:  Several points.  I brought before the

65

1      court a motion for a judgment on the pleadings.  With that

2      motion, I am required to accept all the factual allegations

3      of the complaint as true.  And I'm willing to do that; I

4      don't have a problem with that.

5           The history lecture you got from Mr. Lodge,

6      interesting as it was, I don't think is contained in his

7      complaint and I don't have to accept any of that as true for

8      today's proceedings.  My guess is that if I spent some time

9      and gave the court my version of the history of the last

10     100, 150 years, it would be slightly different than his.

11          The second point, he talked about how the Ohio

12     Supreme Court has a hands-off position on preelection

13     content review of ballot initiatives.  That's not an

14     accurate assessment of the law.  I can cite just in the few

15     minutes I had there thinking about it, I could come up with

16     three cases where they did just that.

17          2018, the Bolzenius case, and that's cited in our

18     brief, where the Supreme Court allowed the Franklin County

19     Board of Elections to keep a municipal initiative off the

20     ballot, the equivalent of the Lake Erie Bill of Rights.

21          2016, State ex rel. Sensible Norwood versus the

22     Hamilton County Board of Elections, that's cited in the

23     briefs.  In that case, they found that the Hamilton County

24     Board did not violate Ohio law when it kept off the ballot

25     an initiative that would decriminalize marijuana.  It would

66

1    in essence repeal Ohio felony drug law.  They found out that

2    that was not a problem.  In fact, it should have been kept

3    off the ballot.

4          The third case that comes to mind quickly is from

14:43:47  5    1967, State ex rel. Rhodes versus the Board of Elections.

6    It's also cited in my motion for judgment on the pleadings.

7    In that case the Supreme Court held it was proper to keep an

8    initiative off the ballot which would order the government

9    to terminate the war in Vietnam.  They found out that was

14:44:06  10    not a proper subject for an initiative and it could be kept

11    off the ballot.

12          There was a statement Mr. Lodge made about 88

13    county board of elections and the varying decisions they

14    might make.  Well, there's a resolution for that.  Any one

14:44:19  15    of those 88 decisions can be addressed by the Ohio Supreme

16    Court via a writ of mandamus, as the Schmitt court recently

17    affirmed.

18          In that case, you won't have 88 different

19    decisions, you'll have one decision going to the Supreme

14:44:31  20    Court and they'll make it once and for all.

21          One other thing.  This power to keep an initiative

22    off the ballot.  I've been doing the board of elections work

23    now for nine and a half years.  It's a power that's rarely

24    used.  I've used it twice.  And just in the last year.  And

14:44:47  25    both initiatives contained the same blatantly

67

1    unconstitutional and unenforceable language, both the Lake

2    Erie Bill of Rights, and there was another one, the downtown

3    jail amendment.  And I recommended to the board that they

4    keep those off the ballot and they did.

14:45:01  5    But that's the only two times in the nine years

6    that I've had to deal with anything like this.  My default

7    position as a county prosecutor is if it's a close call, put

8    it on the ballot.  I've done that with candidates when there

9    have been protests and also with initiatives.  So while this

14:45:16  10    is something for the court to address, this is a power that

11    is rarely, rarely used.

12    Other than that, thank you, Judge.

13    THE COURT:  Thank you, sir.

14    MS. HACKETT:  Your Honor, just one or two things.

14:45:39  15    When you asked Mr. Lodge about what harm he suggests is

16    imminent, he said that it is the harm to the state

17    constitutional right to initiative.

18    And I suggest that under the U.S. Supreme Court

19    cases that I cited in our brief, that is simply not enough.

14:46:03  20    I would ask the court to, when you're reviewing the

21    arguments and our briefs, to look at the Hollingsworth

22    versus Perry case, and it's cited in our brief.

23    And in that case, the court said that you have to

24    have a concrete and particularized imminent injury.  And

14:46:22  25    they said that the doctrine of standing serves to prevent

68

1    the judicial process from being used to usurp the powers of

2    the political branches.

3              So it's keeping the courts in their proper place

4    in our system, and also making sure that what comes out of

14:46:40  5    courts aren't merely advisory opinions.  And that's the

6    reason for the constitutional requirement of standing.

7              Also, the Renne versus Geary case, I talked about

8    it earlier, but I really didn't go into the facts.  In that

9    case, the plaintiffs had challenged a provision in the

14:47:08  10   California Constitution that provided that no political

11   party or party central committee could endorse or support a

12   candidate for a non-partisan office.

13             And the plaintiffs in that case were the

14   Republican Party and the Democratic Party who wanted to

14:47:26  15   include party endorsements in voter pamphlets.  And the

16   court in that case found that there was no standing.  Even

17   though they had party endorsements removed from voter

18   pamphlets in the past, clearly the actions had happened in

19   the past, but going forward, there was nothing showing any

14:47:51  20   threat of imminent injury, and the court found that the fact

21   that the defendants had deleted party endorsements in the

22   past were not enough to establish or demonstrate a live

23   controversy.

24             So I suggest that those U.S. Supreme Court cases

14:48:10  25   are really important here and really dispose of the standing

69

1      issue.

2              And then also -- I guess that's -- I guess that's

3      all I have.

4              THE COURT:  All right, then.

14:48:21   5      MS. HACKETT:  Thank you, Your Honor.

6              THE COURT:  Thank you, Ms. Hackett.

7              Mr. Lodge, you'll get the final word.

8              MR. LODGE:  The Sensible Norwood case is sort of

9      an interesting one, because Justice Fischer of the Ohio

14:48:37  10      Supreme Court has criticized it, I believe twice since --

11      well, in the last couple of years.

12              In it, there was a package of decriminalization

13      for marijuana possession and usage.  And effectively, the

14      entire thing was thrown out because there were -- this isn't

14:48:56  15      the exact wording, but there were provisions that

16      essentially said that the police of Norwood shall not do

17      this or that.

18              So the determination was, that's an administrative

19      order, that's not legislative; therefore, it's an improper

14:49:09  20      initiative.

21              I might point out that an almost identical bundle

22      of marijuana-related changes were enacted in Toledo via

23      initiative, and instead of having the Ohio Supreme Court

24      intervening before the election and vetoing, which

14:49:30  25      incidentally violates their own principle about not

1  inquiring into the substance until something's had a chance

2  to be enacted or not on the ballot, but a common pleas judge

3  in Toledo, basically after the AG filed a declaratory

4  judgment action to try to strike the entire measure, that

14:49:49  5  judge very diligently and properly, exercising the severance

6  clause, kept some of the stuff in the Toledo municipal code

7  and jettisoned other parts of it.  It was a textbook example

8  of post hoc determination by the court system at leisure.

9      And that brings up the problem with the mandamus

14:50:12  10  mechanism.  Justice Fischer and, in fact, the majority in

11  the Walker v. Husted, the 2015 case, points out that the

12  problem with this lightning round of briefing and mandamus

13  activity before the Ohio Supreme Court doesn't allow leisure

14  time for serious understanding and possibly collegial debate

14:50:38  15  among the Ohio Supreme Court justices.

16      I might point out that we have three days to file

17  the merit brief, three days to file the respondent's

18  response, and three days to file a reply.  That's the tone

19  and tenor of the lightning round briefing under the rules of

14:50:56  20  the Ohio Supreme Court in election cases.

21      So the problem is, the standard for mandamus is

22  different from the standard in a direct appeal.  The

23  standard for mandamus, as Justice Fischer and other judges

24  of the Ohio Supreme Court have pointed out, actually means

14:51:13  25  that the secretary of state might not have abused his or her

1    discretion, but that the court might believe that the

2    approval or the ruling made by the secretary of state is

3    unconstitutional, but the Supreme Court would not be able to

4    overturn the determination of the secretary of state because

14:51:35  5    of the standard involved in mandamus.

6         So these matters are time sensitive.  The public

7    interest in something may easily dissipate if there is

8    consequential delay.  I have prosecuted an election case up

9    through the rungs instead of availing myself on behalf of

14:51:57  10   the clients of the speeded-up mechanism of the Ohio Supreme

11   Court.  And, yes, we got a decision, and yes, we won, and it

12   was fully -- I'm believing it was about 20 months after the

13   initial complaint.

14        So the problem is that a direct appeal is not an

14:52:14  15   adequate remedy, and frankly, mandamus may not be altogether

16   an adequate remedy to secure the enforcement consistently.

17        One last thing, Your Honor, is that I just want to

18   remind the court of the example.  When the court's

19   deliberating about the standing of the Mahoning County

14:52:34  20   plaintiffs, I don't believe that you can consider their

21   standing apart from the other plaintiffs and the allegations

22   in the lawsuit.

23        At the same time, as the Mahoning plaintiffs were

24   pursuing something before the Ohio Supreme Court in the Flak

14:52:50  25   case and losing, the Wood County Board of Elections, as I

72

1  indicated, was taking up virtually the identical issue and

2  ruling the other way.

3        That's fine among courts, but it is impermissible

4  preelection censorship of something that isn't even a ripe,

14:53:10  5  enacted law, and it's being done by people who, with all due

6  respect to boards of election, may not be in any particular

7  way qualified to make those kinds of decisions, even with

8  the advice of esteemed counsel like Mr. Pituch.

9        Thank you.

14:53:26  10        THE COURT:  Thank you, sir.

11        Thank you all.  I have heard you fully.  The

12  matter is heard and submitted.  You will receive my ruling

13  soon.  I won't keep you waiting long.  I appreciate the

14  effort, the obvious effort that all of you put into not only

14:53:40  15  your writings, but your oral presentations today.  And I bid

16  you all safe travels.  This matter is adjourned.

17        THE CLERK:  All rise.

18     (Proceedings concluded at 2:53 p.m.)

19                        - - -

20              C E R T I F I C A T E

21     I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

              /s/ Mary L. Uphold        August 3, 2020
24            Mary L. Uphold, RDR, CRR    Date

25